IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 24-cr-00113-NYW

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     **JON MICHAEL HALLFORD**,

        Defendant.

## OBJECTIONS AND RESPONSES TO THE PRESENTENCE REPORT

Mr. Jon Michael Hallford, through his attorney, Assistant Federal Public Defender Laura H. Suelau, files the following objections and corrections to the Presentence Investigation Report (PSR). Doc. 64. Certain of the objections herein are "joint" objections in which co-defendant Mrs. Carie Hallford joins. Those objections are specifically noted for this Court.

Mr. Hallford does not object to the PSR's advisory guideline calculation, however, he responds to certain information contained in that report that may bear on the 18 U.S.C. § 3553(a) factors this Court must consider at sentencing. Pursuant to Rule 32, facts included in a PSR must be relevant. *See also United States v. Booker,* 543 U.S. 220, 257 (2005) (sentencing judges decide sentences "based on relevant information about the offense and the offender…"). Facts included in the PSR must also be true. If a defendant objects to a fact in a PSR, "the government must prove that fact at a sentencing hearing by a preponderance of the evidence." *United States v. McDonald*, 43 F.4th 1090, 1095 (10th Cir. 2022). Although an objection to the reliability of facts alone may not trigger the government's burden of proof, unreliability and lack of independent corroboration are factors this Court may consider when determining whether a given allegation is true. The due process clause protects a defendant's right not

to be sentenced based on materially incorrect information, and hearsay statements may *only* be considered at sentencing if they bear "some minimal indicia of reliability." *United States v. Cook*, 550 F.3d 1292, 1296 (10th Cir. 2008). Importantly, a police report does not inherently satisfy the reliability threshold. *United States v. Padilla,* 793 Fed.Appx. 749 (10th Cir. 2019).

The following objections and clarifications are not provided to avoid or minimize responsibility for the instant offense. Mr. Hallford fully accepts responsibility for and acknowledges harm caused by his actions during this offense. However, picking and choosing what information to provide the Court, or providing irrelevant, unreliable, false, or misleading information distorts both the nature of the offense and Mr. Hallford's history and characteristics and therefore distorts his culpability.

Providing this Court with fulsome and accurate information in this case is particularly important because the probation officer relies on much of the incomplete and misleading information to advocate for a sentence that is over 100 months higher than the bottom of the applicable guideline range. Although the instant case is, in some ways, distinguishable from many fraud cases, it is not so distinguished that it warrants such an upward variance.[1]

 1. **The Hallfords did not evade or attempt to evade law enforcement (Joint).**

Several paragraphs in the PSR insinuate or affirmatively allege that the Hallfords attempted to evade law enforcement after the discovery of the bodies at Penrose in October 2023. That is not true. The Hallfords specifically object to the following statements in the PSR:

   a. **Paragraph 47** – "Jon Hallford failed to show up for the appointment [with DORA]."

---

[1] Of 4,904 cases involving theft, property destruction, and fraud defendants sentenced to a variant sentence in 2023, just 4.5% received an upward variance (97 individuals). The average increase for those 97 individuals was 83.7%, however the average sentence length was just 23 months. Therefore, the sentence advocated for in the PSR is 157 months longer than that received in the average theft and fraud case. USSC, Quick Facts, 2023, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY23.pdf.

b. **Paragraph 47** – "it was suspected that he turned [cell phone] off to evade detection."

c. **Paragraph 53** – "Investigators determined the Hallfords had left Colorado on or about October 4, 2023, once the media became involved."

d. **Paragraph 60** – "On November 8, 2023, the HALLFORDS were arrested by the FBI in Wagoner, Oklahoma, on Unlawful Flight to Avoid Prosecution warrants (as it relates to El Paso County Court, Case No. 2023CR4849 and 2023CR4856)."

e. **Paragraph 79** – "it is noted the defendant left for Oklahoma shortly after the discovery of the Penrose location by law enforcement…" through the end of the paragraph.

Those statements are variously inaccurate or require additional and clarifying information.

First, the Hallfords engaged the services of attorney Jason Gardner on or about October 3, 2023. *See* Doc. 15-1. Thereafter, they were abiding by his legal advice, almost certainly including advisement of their Fifth Amendment rights. Therefore, Mr. Hallford did not "fail" to meet a legal obligation when he declined to speak with a DORA inspector.[2] Nothing in the law required that he meet with an inspector. To the contrary, not meeting with law enforcement (the inspector was actively working with the Fremont County Sheriff's Office) is a common invocation of constitutional rights.

Second, Mr. Hallford did not turn off his cell phone "to evade detection." While law enforcement might have suspected as much, evidence does not support that suspicion and certainly not that conclusion. In any event, a PSR is not for suspicion; it is for relevant and reliable information. The PSR omits the fact that Mrs. Hallford did not discontinue use of her personal cellphone and that law enforcement both knew that number and had reliable information that the couple were together at most

---

[2] At the time the Hallfords were operating Return to Nature, funeral and mortuary services did not have an independent regulatory body and instead fell under the umbrella of the Department of Regulatory Agencies (DORA). A regulatory body was established in 2024, effective January 15, 2025, to regulate funeral homes and crematories in the State of Colorado. https://dpo.colorado.gov/FuneralCrematory.

3

times between October 3, 2023, and their arrest. The Hallfords had agreed to use a single phone as they were together and did not have money to pay two phone bills. This decision is completely understandable given their financial situation at that time. *See* ¶ 126-128.

Third, the Hallfords' decision to take their children and pets to Oklahoma was not an attempt to evade prosecution, detection, or even negative attention for themselves. Instead, they relocated to live with Mr. Hallford's parents in Wagoner, Oklahoma to protect their children and pets. They reasonably believed that they would be arrested and were planning for that inevitability. Mrs. Hallford states that she agreed to move her children to live with her in-laws in Oklahoma because she was afraid they would be traumatized or physically hurt if she was arrested without warning. Mr. Hallford's parents have resided at the same address for over 30 years.

Finally, there is affirmative evidence that the Hallfords were not evading law enforcement. Their attorney, Mr. Gardner, affirmatively contacted the Colorado Bureau of Investigation and the Fremont County Sheriff's Office over phone and e-mail around October 5 and 6, 2023, stating that the Hallfords wanted to cooperate in the investigation and were willing to set up a meeting with law enforcement. Doc. 15-1. Mr. Gardner told law enforcement the Hallfords were out of town. In response, law enforcement (through CBI Agent Christopher Adams) told Mr. Gardner that the investigation was in the "infant stages." At no time did law enforcement instruct the Hallfords (either through Mr. Gardner or directly) to not leave the state.

On October 10, 2023, Mr. Gardner contacted the CBI again, making clear the Hallfords did not intend to evade law enforcement:

**SYNOPSIS:**
Document receiving a phone call from Jason Gardner, attorney for the Hallfords

**ACTION TAKEN:**
On Wednesday, October 10, 2023, at approximately 1618 hours, I, Agent Christopher Adams, received a phone call from Jason Gardner, attorney for Jon and Carie Hallford. Jason informed me that the Hallfords had changed their minds and, at this time, did not want to participate in any interviews. Jason informed me that if charges were filed or an arrest warrant was issued, to please get in touch with him, and he would facilitate the Hallfords turning themselves in. He said they had no intention of running.

**ATTACHMENTS:**
N/A


On November 7, 2023, El Paso County issued warrants for the Hallfords. Rather than contacting Mr. Gardner, taking him up on the offer to facilitate the Hallfords' surrender, and arranging for their return from Oklahoma, FBI Special Agent Andrew Cohen[3] authored an affidavit to District of Colorado Magistrate Judge James P. O'Hara affirming probable cause to believe Mr. and Mrs. Hallford "did move and travel in interstate commerce with intent to avoid prosecution, custody, and confinement after conviction under the laws of the State of Colorado for crimes which are felonies under the laws of the State of Colorado, all in violation of 18 U.S.C. § 1073(1)." D. Colo., 23-mj-00187, Doc. 1-2 (E.D.OK. case no. 23-mj-00278-JAR). Materially omitted from that affidavit was the fact that the Hallfords, through their attorney, had previously contacted law enforcement. Also omitted was information provided by Mr. Gardner about the Hallfords' whereabouts[4], or his offer to "facilitate the Hallfords turning themselves in." Neither Agent Cohen, nor any other law enforcement officer, contacted Mr. Gardner. They also did

---

[3] According to numerous police reports and affidavits for search warrants, SA Cohen and CBI SA Adams, who had communicated directly with Mr. Gardner, worked together closely (if not on a daily basis) during this investigation.

[4] The affidavit states "On or about October 17, 2023, investigators executed a search warrant at the Hallford's residence at 7679 Crestone Peak Trail, Colorado Springs, Colorado. The Hallfords were not located at the residence, and items such as their toothbrushes were missing," but omits that law enforcement was aware (through Mr. Gardner) that that Hallfords were out of town.

not contact Mrs. Hallford's phone which they knew to be in her possession. *Id.* ("Geolocation of the telephone believed to be utilized by Carie Hallford placed the cellular device routinely north of Wagoner, OK from mid October 2023 to November 7, 2023.").

On November 8, 2023, state and federal law enforcement arrested Mr. and Mrs. Hallford without incident (despite their unnecessary use of force) at the home of Mr. Hallford's parents.

2. **There are not additional, unaccounted for, victims that were water cremated, destroyed with lye, or otherwise disposed.**

The PSR variously affirmatively alleges or insinuates that there are additional, unaccounted for, victims. The instant offense is already distressing to families of the deceased who used Return to Nature's services and such an unsupported insinuation is both reckless and false. As outlined in the factual basis for the Plea Agreement, the Hallfords agreed to, but failed to provide cremations or burials for approximately 190 individuals. They did not, however, dispose of any additional bodies. One hundred ninety (190) bodies, placed there between 2019 to 2023, were discovered at Penrose. In a moment of extreme stress, Mr. Hallford contemplated options to dispose of the bodies at Penrose, but he never employed those options. Had Mr. Hallford sincerely intended or actually carried out those plans outlined in text messages he sent in October 2020, ¶ 65, those bodies would not have been located. Instead, there is no evidence that either Hallford did anything but store remains at the Penrose building. The Hallfords specifically object to the following statements in the PSR:

   a. **Paragraph 49** – "Investigators recovered lye (which can be used to dissolve a body)." Mr. Hallford denies using lye to dissolve bodies. There is no evidence he used lye for that purpose or that the lye located at Penrose had been opened and used at all. It should also be noted that lye is used in alkaline hydrolysis, discussed *infra*.

   b. **Paragraph 49 (Joint)** - "It is not known how many bodies may have been successfully dissolved." This statement is a gross and unsupported speculation that is harmful to both the Hallfords

6

and the victims in this case. The Hallfords object to this statement as untrue, prejudicial and unsupported by fact. The remains found in Penrose represent all the victims in this case.

   c. **Paragraph 49 –** "In one of the rooms, the funeral home was experimenting with water cremation, which can dissolve a body in four to six hours." There is no evidence that Mr. Hallford ever employed water cremation on a body. The probation officer offers unsupported and uncited assertions about the water cremation (alkaline hydrolysis) process and relies on misleading evidence. For example, the existence of "femur bones" is not evidence that such cremation took place. Indeed, alkaline hydrolysis would result in bone fragments, not intact bones.[5] Discovery provided by the government indicates that the Hallfords intended to offer alkaline hydrolysis as a service, and purchased the machine for that purpose, however, they were never operational.

   d. **Paragraph 49 (Joint) –** "A search warrant for JON HALLFORD's Home Depot records reflect that from March 2020 to January 2023, 660 pounds of Quikrete concrete mix had been purchased." A more complete statement would include that Quikrete is most often sold in 90-, 80-, or 60-pound bags.[6] Therefore, the 660 pounds number roughly correlates to between eight and eleven bags total, or the purchase of a single bag every three months over 35 months.

   e. **Paragraph 65 –** All of the communications contained herein are provided without context. To the extent this paragraph insinuates the Hallfords intended to carry out plans discussed via text message in October 2020 and January 2023, no such plans had been carried out by the time of their arrest in November 2023.

---

[5] *See* Cremation Association of North America, Cremation Process https://www.cremationassociation.org/cremationprocess.html.
[6] *See* Home Depot, https://www.homedepot.com/p/Quikrete-90-lb-Concrete-Mix-110190/100318523.

### 3. The PSR contains falsehoods and inaccuracies about the cremation process (Joint).

The Hallfords did not own a crematory (retort) machine. The cost to install such a machine is approximately $250,000, not including licensing, permitting, and other fees.[7] Therefore, they contracted with several different crematories in the Front Range. Those businesses all follow the same general process of identifying the deceased, placing the deceased in the cremation chamber, closing the door, and then using flame and heat to reduce the remains to bone fragments. That process generally takes one to two hours. Thereafter, bone fragments are removed from the chamber to cool and eventually be taken to a processor. Therefore, an individual's "remains" consist only of their bones.[8]

Based on the forgoing, Mr. Hallford specifically objects to the following paragraphs:

    a. **Paragraph 57** – "Some families reported the cremains did not match the size of their loved one, with one indicating they received the same amount as compared to the ashes of their dog, and another received a smaller amount when the decedent was over 400 pounds." This paragraph repeats speculation by grieving family members about their loved ones. While such speculation by victims is understandable, including such speculation without clarifying facts in the PSR is not. Because cremated remains consist only of a decedent's bones, an individual's weight is not indicative of the volume of their remains. Instead, cremains are generally between four and six pounds and depend entirely on an individual's bone size and density, not their weight.[9]

---

[7] *See,* Metal Building Crematory Design, https://www.cremsys.com/wp-content/uploads/2021/09/Metal-Turnkey-data_9-2021_WEB.pdf, Additionally, counsel consulted with a funeral home director who owns and operates a crematory (and asked to not be identified). That director, who recently installed a second retort for his business, estimated $250,000.

[8] *See* Cremation Association of North America, *Cremation Process* https://www.cremationassociation.org/cremationprocess.html.

[9] *Id.* ("Tissue, organs, body fat, and casket or other container materials burn off as gases and move to a secondary chamber, where they continue to undergo combustion…The bone fragments remain in the primary chamber. The average weight of adult cremated remains is between four and six pounds; a tiny percentage of the body's original mass."). The director with whom counsel consulted stated the same. The director opined that it would not be unusual for the volume of a dog's remains to be like a human's remains and stated that factors like age, health, and height are far more indicative of bone

8

b. **Paragraph 49** – "It is not customary practice to have a bone grinder unless the business operates a crematory." The probation officer offers no support for that assertion. The Hallfords contracted with multiple crematories that likely provided different consistencies for remains. Based on business records provided by those crematories, Return to Nature *did* carry out legitimate services for the majority of their 1,178 customers. For the nearly 900 legitimate cremations, Return to Nature could have employed a bone grinder if the remains delivered by a crematory were returned in an unacceptable consistency.

4. **Mr. Hallford objects to loss amounts not stipulated by the parties in the Plea Agreement.**

   a. **Paragraph 84: Accrued Interest** – Mr. Hallford agrees with the government and joins in their objection to the inclusion of interest. Doc. 68 (1). Accrued interest of $119,535.52 resulting from the EIDL fraud of $1,010,983.08 should not be included in the total loss or restitution calculation. *See* USSG §2B1., app. n. 3(D)(i)

   b. **Paragraph 69: EIDL Loan** – Mr. Hallford agrees with the government and joins in their objection to the inclusion of a $15,000 loan advance in the loss or restitution calculation. Doc. 68 (1). The government has not presented any evidence that that advance was the result of fraud or otherwise illegal.

   c. **Paragraph 77: Restitution** – Mr. Hallford agrees with the government's restitution calculation and that the total restitution due to the SBA is $876,447.56. Doc. 68 (1).

5. **Paragraph 45 (Joint)** – "In addition to the two locations from which the HALLFORDS ran their funeral home business, they also had a storefront location at 815 E. Platte Ave in Colorado Springs. The Elkton location was also a storefront location, and both were in El Paso County." That is untrue and should be corrected. The Hallfords maintain, consistent with discovery provided by the government in this case and Special Agent Andrew Cohen's testimony before the Grand Jury, they

---

density than weight. *See,* Mayo Clinic, Fact Sheet on Bone Health, https://www.mayoclinic.org/healthy-lifestyle/adult-health/in-depth/bone-health/art-20045060.

had a storefront location at E. Platte Avenue until around July 2023. They moved the business to the Elkton Drive location thereafter. There were not two storefront locations in El Paso County.

6. **Paragraph 48** – Mr. Hallford denies the allegation that "some children" were recovered from Penrose. That allegation is likely based on a probable cause affidavit authored in October 2023, before the remains found in Penrose were identified. The government has presented no evidence to support that allegation and none of the Victim Impact Statements evidence that a child's body was recovered from Penrose. *See* Exhibits to the PSR. Mr. Hallford maintains that he made a conscious decision to not place the bodies of children at Penrose.

7. **Paragraph 49** – "None of the three refrigerators were functioning properly…" Mr. Hallford offers additional and clarifying information. Employees interviewed by law enforcement noted that they'd been in the Penrose location and stated there were three functional refrigerators (coolers). Mr. Hallford states that the refrigerators failed around July 2023 when an air conditioning unit failed. Thereafter, all three refrigerators overheated and failed.

8. **Paragraph 57** – "The victim also found it strange the funeral home would not disclose the specific location of the tree they planted that was supposed to contain a small amount of his mother's cremains." It seems the victim referenced misunderstood the Hallfords' practice of purchasing a memorial or tribute tree in honor of the deceased. Discovery provided by the government shows the Hallfords donated $1 to One Tree Planted 501(c)(3) for each of their customers.[10] They did not, however, promise to deposit a decedent's cremains with the tree as they were not involved in the tree planting. Families were then provided a "Tree Certificate" from One Tree Planted stating their contribution was "essential to the restoration, conservation, and protection of endangered forests across the world."

---

[10] One Tree Planted, https://onetreeplanted.org/.

9. **Paragraph 62** – Mr. Hallford offers additional and clarifying information about the purchase and sale of vehicles. First, the Yukon was purchased for the purpose of serving as a pallbearer vehicle. Later, due to financial difficulties, the vehicle was sold, after which the Hallfords purchased a substantially less-expensive vehicle. This paragraph is not relevant except to establish what is already known to this Court – the Hallfords had extensive financial difficulties.

10. **Paragraph 64** – Mr. Hallford objects to the selective inclusion of text communications between he and Mrs. Hallford, all of which are provided without context. For example, including the statement "gas all the way around," without more context is highly misleading. Mr. Hallford was communicating, "put gas in the cars," but read in isolation, it sounds more nefarious.

The PSR also omits moments of regret and reflection by Mr. Hallford ("I'm seriously in a panic and regret doing every bit of this,") sentiments of care towards his wife and children ("I'm just not being as good of a husband to you as I should be,") and self-doubt ("I hate not knowing what to do, my stomach is a disaster."). Without the entire context of their communication, the inclusion of selective text messages is misleading. Moreover, the texts are both highly prejudicial and not relevant. Those texts should be struck from the PSR.

11. **Paragraph 66** – Mr. Hallford does not deny that he had outstanding child support obligations. He notes, however, that his son with Stephanie Hallford moved to Colorado around March 2019.[11] Before that, Mr. Hallford regularly provided financial support for his son. Thereafter, Mr. Hallford was his son's primary caregiver and supported him financially.

12. **Paragraph 67** – The inclusion of the information in this paragraph is baffling and it should be struck from the PSR. The information contained therein is not relevant to the instant offense or any of the 18 U.S.C. § 3553(a) factors this Court should consider when imposing a sentence, and lacks any indicia

---

[11] Counsel verified this information during an interview with the son.

of reliability. Instead, it is akin to impermissible character evidence and lacks any evidentiary support. Mr. Hallford is entitled to the presumption of innocence, and therefore does not comment on the investigation referenced. Counsel notes, however, that the crime referenced occurred nearly 13 years ago. It appears that OSBI investigated the crime, and yet, Mr. Hallford has never been charged or arrested in connection with that offense.

**13. Paragraph 110 –** Mr. Hallford denies that he owes any outstanding child support to Kristin Hallford for his adult child from that marriage, nor does the PSR's selective recitation of docket entries support that allegation.

**14. Special Condition of Supervised Release 7 –** Mr. Hallford does not object to an occupation restriction. He notes, however, that he has never engaged in the "body broker" business. Despite the PSR's repeated references to *United States v. Hess,* 106 F.4th 1011 (10th Cir. 2024), the instant case is factually distinct, not in the least because Mr. Hallford never engaged in or profited from the illegal sale of human remains. To the extent that the inclusion of this condition implies as much, he denies such conduct. The condition should be modified to omit "body broker."

    Respectfully submitted,

    VIRGINIA L. GRADY
    Federal Public Defender


    s/ Laura H. Suelau
    LAURA H. SUELAU
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  8020
    Telephone: (303) 294-7002
    FAX: (303) 294-1192
    laura_suelau@fd.org
    Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2025, I filed the foregoing **OBJECTIONS AND RESPONSES TO THE PRESENTENCE INVESTIGATION REPORT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Craig Fansler, Assistant United States Attorney
Email: craig.fansler2@usdoj.gov

Tim Neff, Assistant United States Attorney
Email: Tim.Neff@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Jon M. Hallford (via U.S. Mail)

s/ Laura H. Suelau
LAURA H. SUELAU
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
laura_suelau@fd.org
Attorney for Defendant