**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  24-cr-00113-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  JON M. HALLFORD,

      Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT FOR DEFENDANT JON HALLFORD**

---

The United States of America respectfully files this Sentencing Statement for Defendant Jon Hallford.

The Government requests that the Court sentence the Defendant to a 180-month (15-year) term of imprisonment, which is the maximum amount of prison time contemplated in the parties' plea agreement[1] (*Jon Hallford Plea Agreement*, at 3 [#52]) and consistent with the recommendation contained within the Presentence Report ("PSR"), Exhibit A, R-1 [#73-1].

---

[1] On February 24, 2025, the Court rejected the parties' plea agreement and stated that it would not be bound by the parties' stipulated sentencing range (between 78 months to 180 months imprisonment) pursuant to Rule 11(c)(1)(C). [#79, Minute Order]. On March 5, 2025, the Defendant elected to proceed pursuant to Rule 11(c)(1)(B), as confirmed in the parties' Plea Supplement. [#85]. Accordingly, the Court may sentence the Defendant up to the statutory maximum of 20 years imprisonment for the present offense. However, because the Government agreed as part of the original plea agreement not to seek a sentence higher than 15 years' imprisonment, the Government remains consistent with this position and recommends a 15 years of imprisonment.

Here, the PSR states that the advisory guideline range is 78 to 97 months imprisonment. *Id.* The matter before the Court is not an ordinary case, however, and the extraordinary harm suffered by the victims and community in this case warrant a significantly higher sentence than recommended by the guidelines. By separate pleading, the Government sets forth the basis upon which it seeks a sentence above the applicable guidelines. In order to impose a 180-month sentence, the Court would need to find that an upward variance and/or upward departure from the guidelines is appropriate.

*Sentencing Factors 18 U.S.C. § 3553(a)*

*(1) Nature and Circumstances of Offense*

The Defendant pled guilty to Count 11 of the Indictment charging him with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. The PSR provides a detailed and comprehensive review of the pertinent facts describing the Defendant's role and participation in the underlying offense and thus, the Government does not repeat all of the facts here.[2] PSR ¶¶ 10-45. It is important to note that the Defendant has stipulated that the underlying facts are true and correct as set forth in his Plea Agreement and incorporated within the PSR as part of relevant conduct. PSR ¶ 9. Further, the Defendant has agreed as part of the sentencing guidelines calculations that various sentencing enhancements apply including: ten or more victims, sophisticated means, conscious or reckless risk of death or serious bodily injury, vulnerable victim, and abuse of trust. PSR ¶¶ 85-87, 89-90.

---

[2]  The Government has contemporaneously filed a Motion Seeking an Upward Variance Pursuant to 18 U.S.C. § 3553(a) and/or an Upward Departure Pursuant to U.S.S.G. § 2B1.1 and § 5K2.0. Within such Motion, the Government discusses facts and information relevant to the offense conduct. Here, the Government incorporates by reference such pleading and any pertinent facts set forth therein.

When evaluating the nature of the offense conduct, it is important to keep in mind the multiple ways in which the Hallford's scheme harmed others.

The easiest harm to quantify is the economic harm. The scheme defrauded approximately 190 funeral-home victims of monetary funds. Put simply, the Defendant knowingly failed to provide proper cremations or burial services for 190 bodies despite contractually promising the families otherwise. PSR ¶ 22. Instead, the victims paid approximately $189,371 in aggregate for funeral services which the Defendants failed to ever provide. PSR ¶ 145. The Defendant and his wife often lied to the victims and next of kin by providing concrete mix instead of cremains. PSR ¶ 26. In this respect, the crime was a classic bait and switch swindle. As a result, the Defendants' business, Return to Nature, reaped an unjust financial windfall for services which it never rendered -- all to the economic detriment of the victims.

The economic harm also included the Hallfords' efforts to deceive the U.S. Small Business Administration ("SBA") out of approximately $882,300 in Covid-relief funds through fraudulent loan statements and certifications. Despite receiving these funds through November 2021—well after the date by which bodies were accumulating at Penrose—the Hallfords did not use any of these funds to remedy past wrongs or to treat victims with dignity, but they instead converted much of the money to satisfy personal greed. For example, they misused the loan proceeds to purchase a $92,000 vehicle along with spending it on frivolous personal expenditures. PSR ¶ 42. In a May 9, 2022 text message, Jon Hallford reflected on his personal spending of COVID-relief loans, and ignoring the mounting horror at Penrose, still did not consider doing the right thing but

instead weighed only the options of personal extravagance and building "a several hundred dollar nest egg":

> I honestly wish six months ago I had realized we were not getting 2 million, or that you would have made that clear to me when you realized that I was thinking on those terms. Had I realized what was actually happening I would have never bought that Denali or Land Rover or spent the money that I have spent on survival or trips or meals or sound equipment or any of those things. If I could take every bit of it back and have a several hundred thousand dollar nest egg right now I absolutely would. No one is suffering inside more than I am about

(Government Exhibit 1, p. 1). Ultimately, the SBA (i.e. – taxpayers) was deprived of these funds, and it is unlikely to recoup such losses given the Defendant's indigency and imminent prison sentence.

The Hallfords's crimes also resulted in harms that were difficult or impossible to quantify in monetary terms. The Hallfords submitted false death certificates to the State of Colorado which subsequently had to be amended. PSR ¶ 24. Similarly, third party businesses who provided cremation services for Return to Nature sometimes misidentified bodies within their own records based on misrepresentations by the Hallfords, exposing them to unnecessary liability. PSR ¶ 25. On at least two occasions, the wrong remains of bodies were buried by the Hallfords. This conduct resulted in two subsequent exhumations and forced families to go through the relived trauma of reburying a loved one. PSR ¶ 26. And each third-party entity that was harmed had to update records and to follow processes that necessarily resulted in notifying and obtaining information from victims. These notifications resulted in renewed angst and anxiety for victims who were already grieving and who have expressed in victim impact letters that one effect of the Hallfords' actions was that they have been unable to obtain meaningful closure.

Victims, some whom entrusted multiple family members to the Hallfords' care, have remarked that the harm is not limited to the 190 families who received confirmation

and some measure of certainty that their loved ones were found in Penrose. It extends to the hundreds of other customers of Return to Nature who received services and urns from the Hallfords during the period covered by the fraud scheme, many of whom may remain uncertain for the rest of their lives about the contents of the urn they received. As many victims eloquently described, sometimes the only way to process grief over the death of a loved one is to speak to an urn that is buried under a tree, or placed in a sacred spot in a home, and the Defendant's crime took away that solace for hundreds of grieving families.

Nor was the harm limited to customers of Return to Nature funeral home. The nature of the Defendant's crime impacted the entire community in and around Colorado Springs by eroding the public's trust and confidence in the funeral-home industry. Although impossible to measure the full extent of such harm, individuals anywhere within the Colorado Springs area were left to doubt the legitimacy of funeral-home businesses going forward. As a result, the Defendant's conduct tarnished the image of other reputable businesses who honestly provided essential services in this sensitive area.

In the course of swindling the victims out of their money, the Defendant also inflicted untold trauma on the families who trusted him. This trauma makes the Defendant's fraud scheme far worse than a routine fraud case. To the horror of some of the victims, they later learned from law enforcement that their loved ones' bodies had been left to decay and decompose in unimaginable circumstances at the Penrose location. The Defendant's actions resulted in extreme emotional distress for numerous victims at a time when many were still grieving the loss of a loved one.

The Government cannot adequately capture in words the extent of the victims' pain, as it is incalculable in depth and scope. Rather, the multiple victim impact statements submitted to the Court provide the best description of the damage caused by the crime along with the range of emotions felt by the victims which includes despair, disbelief, betrayal, anger, vengeance, sadness, frustration, and grief, etc. Regrettably for many of the victims, the wounds caused by the indignities of the offense have been so great that it has been difficult for them to move on in their lives. Some victims have described suffering physical and medical infirmities due to the offense. Victims have underwent counseling and therapy in the aftermath. Many victims had traveled far distances and participated in sacred ceremonies to obtain closure and honor the wishes of the deceased, only to find out months or years later the ashes they spread did not belong to their loved ones, and that the sacred place where they visited and grieved in an attempt to honor the dead did not contain their loved ones' remains. The trauma this caused for family members is incalculable: they thought they were burying or spreading ashes of a wife near a husband, or burying ashes in a military cemetery or special place like Hawaii or Tahoe, or under a tree or bench that they could visit for the rest of their lives, only to find out and have to process death anew months later. The victims' letters provide vivid pictures of the harm stemming from the Defendant's crimes and the resultant doubts and uncertainties, such as how the bodies of their loved ones were treated while at Penrose, how many times they were moved or lifted, how their privacy and dignity interests were violated, and countless other unanswerable questions.

In sum, the toll caused by Jon Hallford's conduct has been enormous and immeasurable. The negative emotional, health, psychological, financial, and societal

consequences for the victims from the offense and others collaterally impacted must be taken into account at sentencing in order for there to be any justice in this case.

*(2) History and Characteristics of the Defendant*

As it relates to the Defendant's history and characteristics, the Defendant has no notable criminal record. The present case represents his first felony conviction. PSR ¶¶ 97-102. Based on the underlying conduct, the Defendant is also awaiting sentencing in state court for multiple felony counts for abuse of corpse in violation of C.R.S. 18-13-101.

However, the Defendant's formal criminal record paints an incomplete picture related to his history and characteristics given the scope and length of this crime. The Defendant's fraudulent conduct spanned four years (September 15, 2019, to October 5, 2023), and impacted the families and next of kin of 190 individuals. In the course of operating his business and carrying out his fraud scheme, the Defendant regularly interacted with the victims on multiple occasions over an extended period. To keep the horrific fraud scheme hidden, the Defendant told countless lies to the families and engaged in daily, deliberate falsehoods to victims and their families at moments of vulnerability and after multiple interactions designed to build trust. The lies started with Return to Nature's upfront commitments about treating each deceased person with dignity. These initial lies were followed by formal contractual promises that the remains of the deceased would be well-cared for and properly handled in a dignified manner. Eventually, the Hallfords provided grief-stricken family members with urns full of concrete mix. When some victims asked directly what was in the urn, the Hallfords looked them in the eye and lied. All the while, the Defendant was falsely reassuring the victims that he

truly cared for their deceased loved ones. In the midst of this conduct, the Defendant entered the macabre Penrose building on a daily basis, where he was confronted with the magnitude of his crime. There he continuously stacked bodies like cord wood as human decomposition fluid pooled on the floor and the awful stench from rotting corpses permeated the air. To cover up his conduct, the Defendant covered the windows and doors of his building, caused false death certificates to be filed with the state, and in a handful of instances, even caused the burial of a wrong body in a grave.

Approximately one year into his fraud scheme, the Defendant sent a text to Carie Hallford on October 6, 2020 which showed the depth of his callousness:

> By December 6th we need to begin cleaning and restoring the building in Penrose to be out by Dec. 31st.
>
> Options
>
> A. - Build a new machine ASAP
>
> B. Dig a big hole and use lye
>
> Where ?
>
> C. Dig a small hole and build a large fire
>
> Where ?
>
> D. I go to prison, which is probably what's going to happen.

PSR ¶ 65 (Government Exhibit 1, p. 2). In another text to Carie Hallford, on May 5, 2020, the Defendant expressed his lack of care for the victims:

> I don't give a fuck about this family, I'll give a fuck about what's happening in Penrose are not going to prison and getting the fuck out of this community. My one and only focus is keeping us out of jail, what is yours?

PSR ¶ 64 (Government Exhibit 1, p. 3). Remarkably, despite recognizing that his conduct was illegal and would likely result in imprisonment, the Defendant made no efforts to change for another three years. The Defendant clearly had a self-awareness that his

conduct was inhumane and warranted prison time. In one text message, for example, on April 6, 2023, he stated:

> Gas all the way around and it wouldn't hurt to get a couple folding tables for Penrose so we don't have to put anyone else on the floor

PSR ¶ 64 (Government Exhibit 1, p. 4). The Defendant's text communications ring loud and clear: he was not concerned about the families seeking his services in a time of need but only with covering his tracks and avoiding personal responsibility.

In short, the Defendant's repeated and callous behavior during the four-year period of the fraud scheme is more relevant to his history and characteristics than his lack of formal criminal history.

*(3) Seriousness of Offense, Promote Respect for Law, and Provide Just Punishment*

Here, the Defendant's criminal conduct warrants a substantial prison sentence to account for the seriousness of the offense, to ensure that others have a healthy respect for the law, and to provide just punishment. The Defendant's conduct while defrauding funeral home customers was by any measure horrific and morbid. The Defendant and his wife took advantage of victims who were at their lowest point given the recent loss of a loved one. The fragile emotional state of many of the victims during their bereavement cannot be overstated. While the victims were emotionally vulnerable due to their gut-wrenching grief, the Defendant played a central role in carrying out the underlying fraud.

Instead of dutifully performing cremations for the recently deceased in a dignified manner—as was his contractual and moral obligation—the Defendant abused multiple corpses. In doing so, he violated the sacred trust that the victims and the next of kin placed in him. The Defendant participated in the ultimate indignity by allowing 190 bodies to remain in various states of decay and decomposition at his business despite promising

victims that Return to Nature would guide the families through the bereavement process in a dignified way. As reflected in many of the victim statements to the Court, the Defendant's conduct caused untold emotional distress which will haunt many of the victims forever and replaced happy final memories of victims' loved ones with the horrifying images of the way the Defendant left their corpses to decay. By sentencing the Defendant to a lengthy prison sentence, the Court can restore some semblance of justice, albeit imperfect. A lengthy prison sentence will signal to others that the law must be respected and that individuals like the Defendant who decide to violate society's basic norms will ultimately be accountable for their actions.

The Defendant also needs punished for the over $800,000 in Covid-relief funds which he fraudulently obtained. The funds were specifically earmarked for qualifying individuals who suffered from adverse business consequences during the pandemic. Sadly, the Defendant took improper advantage of the government relief plan designed to help small businesses. The relief funds—if properly applied—could have been used by the Hallfords to conduct proper cremations and burials for their customers. Instead, the Defendant and his wife lied on the initial loan application to obtain the funds and then misused the funds to support a spendthrift lifestyle, squandering the funds on jewelry, cosmetic medical procedures, cryptocurrency, entertainment and vacations. The Defendant's flagrant abuse of such funds under the current circumstances warrants a substantial prison term.

### (4) Afford Adequate Deterrence and Protect the Public from Further Crimes

As noted above, the Defendant's underlying fraud scheme abused the victims' trust and resulted in substantial financial losses for the victims as well as unjustified emotional

trauma and social harm. Instead of using the victims' hard-earned money for promised cremations or burials, the Defendant and Carie Hallford pocketed funds for their personal benefit while failing to provide funeral services. The Defendants knowingly and repeatedly allowed deceased bodies to languish, unattended in deplorable conditions. The Defendants also exploited SBA Covid-relief programs intended to provide a lifeline for struggling small businesses for personal expenses.

To ensure general deterrence for like-minded fraudsters in the future, the Government requests that the Court impose a substantial imprisonment sentence of 180 months. Such a sentence will send the message to the public that similar criminal conduct will be treated seriously by the law and that participation in such a scheme will always result in meaningful prison time. The Defendant not only committed the financial crime of wire fraud but in doing so, he gravely overstepped societal norms related to the treatment of human remains. Others inclined to engage in this criminal conduct should be put on notice that substantial imprisonment will inevitably result should they follow in the same misguided path.

There is also a need for specific deterrence as it relates to Jon Hallford. He is 45 years old and maintains the ability to gain employment in the future. He knew what he was doing was wrong but weighed the benefits and risks of crime and decided to continue acting for his own benefit rather than treating the individuals entrusted to his care with dignity and respect. To ensure that innocent members of the public are protected and the Defendant is prevented from returning to his deceitful business practices, the Court should impose a substantial imprisonment sentence.

   *(5) Provide Defendant with Needed Educational or Vocational Training, or other Medical Care or Correctional Treatment*

The PSR does not indicate that the Defendant has any particularized needs in connection with his sentence. He appears to be in good health and physical condition; he has no apparent substance abuse issues. PSR ¶¶ 114, 117-118. The Defendant has a high school degree and has completed various general studies at a bible college; he also obtained an "applied science degree in funeral services" in 2004 from the Dallas Institute of Funeral Service. PSR ¶¶ 119-120. The Defendant's work experience since 2004 has been working in the funeral business, including working for his parents' funeral home from 2009 to 2013. PSR ¶¶ 121-123. Finally, it does not appear that the Defendant suffers from any mental health illness. PSR ¶ 116.

In sum, the PSR does not report that the Defendant has any particular educational, vocational, medical or physical conditions that require special consideration as part of his sentence.

*(6) Need for Sentence to Avoid Unwarranted Disparities Among Defendants With Similar Records Found Guilty of Similar Conduct*

Conducting a meaningful disparity analysis between the Defendant and other similar defendants is of limited value given the paucity of reported cases involving defendants engaging in similar conduct. Here, the Government conducted a canvas of the federal reporter looking for similar cases but was unable to find any congruent ones save one.

Specifically, *United States v. Megan Hess and Shirley Koch*, 106 F.4th 1011 (10th Cir. 2024) involved conduct implicating some of the same factual issues involved in the present matter. In *Hess*, the defendants were a mother and daughter team who each pled guilty to the offense of mail fraud in connection with the operation of their family funeral

home and body broker business. *Id.* at 1020-21. Among other things, Hess and Koch worked together to defraud hundreds of customers by falsely representing that they would provide a cremation or burial services for the victims' next of kin. *Id.* at 1020. Instead, the duo "frequently … exceeded the authority which they obtained" as it related to decedents' remains. *Id.* at 1019. In numerous cases, "body parts beyond those which were authorized, if not entire bodies, would be sold [by Hess and Koch] typically for purposes not even contemplated or agreed to by the victims." *Id.* Like here,[3] "families were given cremains 'that were represented as that of their loved ones when that was not true.' Instead, those cremains were either replaced or mixed with the remains of others." *Id.*

At sentencing, Judge Arguello imposed an upward variant sentence as to each defendant. Hess received the statutory maximum of 240 months imprisonment while Koch received 180 months. *Id.* 1022. The Tenth Circuit remanded the matter for resentencing as to both defendants based on various guideline issues. The case remains set for resentencing on April 21, 2025, so the final sentence has yet to be imposed.

Nonetheless, the Court may look to *Hess* for some limited guidance when conducting its disparity analysis and considering whether an upward variance is appropriate. Like in *Hess*, the present case is nothing like the run-of-the-mill fraud scheme that primarily results in economic harm to immediate victims. Instead, the Defendant's conduct breached all bounds of societal norms and decency when he chose to continuously allow 190 bodies to rot and decay in their funeral home, contrary to the wishes of the families and terms of the victims' funeral contracts. Like in *Hess*, the

---

[3]   "The Hallfords – in a number of instances – provided the decedent's family members, friends, or designated next-of-kin with an urn filled with dry concrete mix instead of the actual cremains of the deceased." PSR ¶ 26.

Defendant betrayed all trust which families placed in him to properly handle the remains of loved ones in a dignified manner. Instead, the Defendant and his wife defiled and disrespected the remains of the loved ones, deceived the families by providing concreted mix rather than actual cremains, and carried out their cruel conduct for a four-year period.

In short, the parallels between the two cases is noteworthy, and certainly supports the imposition of a sentence significantly higher than recommended by the advisory guidelines. Aside from *Hess*, there appears to be a dearth of cases with a similar fact pattern as the present one. The macabre nature of the underlying offense along with the Defendants' calculating and callous manner in which they carried it out makes it a unique outlier, with few other cases for comparison. Consequently, the Government's recommended sentence would not result in a disparate outcome as there is a lack of similarly situated defendants from which to make a meaningful comparison. Ultimately when fashioning its sentence in the present matter, the Court will necessarily need to consider the various aggravating factors which make the criminal conduct so unique.

*(7) Need to Provide Restitution to Victims*

The victims are entitled to a substantial amount of restitution as part of the sentence in this case. As noted in the PSR, there are two financial victims for purposes of restitution in this case: (1) the victims from the funeral home fraud scheme, and (2) the U.S. Small Business Administration. Exhibit A, R-1. Under federal law 18 U.S.C. § 3664(i), the individual victims harmed by the Hallfords are entitled to priority while the SBA's right to restitution is secondary.

As noted in many victim impact statements, the families of the deceased have suffered immeasurably as a result of the underlying offense. Undoubtedly, receiving any

14

restitution payments as soon as possible would certainly be of a benefit to such victims. Nonetheless, the need for the victims to be recompensed must be balanced against the other important factors set forth in § 3553(a) such as ensuring just punishment and the protection of the public. Unfortunately, it does not appear from the Defendant's financial condition that he will be in a position to make any meaningful restitution payments in the near future given that he is indigent and has virtually no assets. PSR ¶¶ 126-130.

WHEREFORE, the Government requests that the Court impose an imprisonment sentence to 180 months imprisonment.

Respectfully submitted this 6th day of March, 2025.

J. Bishop Grewell
Acting United States Attorney

By:  s/ Tim Neff
Tim Neff
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: Tim.Neff@usdoj.gov
Attorney for the Government

By: s/ Craig G. Fansler
Craig G. Fansler
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: Craig.Fansler2@usdoj.gov
Attorney for the Government

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of March, 2025, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT FOR DEFENDANT JON HALLFORD** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

By: *s/Ilmira Allazova*
        Legal Administrative Specialist
        United States Attorney's Office