1                     IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 24-cr-113-NYW-1

4     UNITED STATES OF AMERICA,

5            Plaintiff,

6            vs.

7     Jon M. Hallford,

8            Defendant.

9    ----------------------------------------------------------------

10                         REPORTER'S TRANSCRIPT

11                          Sentencing Hearing

12   ----------------------------------------------------------------

13          Proceedings before the HONORABLE NINA Y. WANG, Judge,
     United States District Court for the District of Colorado,
14   commencing on the 27th day of June, 2025, in Courtroom A902,
     United States Courthouse, Denver, Colorado.
15

16                             APPEARANCES
     For the Plaintiff:
17   TIM R. NEFF and CRAIG G. FANSLER, United States Attorney's
     Office, 1801 California Street, Suite 1600, Denver, CO 80202
18

19
     For the Defendant:
20   LAURA H. SUELAU, Federal Public Defender's Office, 633 17th
     Street, Suite 1000, Denver, CO 80202
21

22

23

24
     Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
25   A259, Denver, CO 80294, (303)335-2358

       Proceedings reported by mechanical stenography; transcription
                       produced via computer.

```
24-cr-113-NYW-1    Sentencing Hearing    06-27-2025
```

1                    P R O C E E D I N G S

2        (Proceedings commenced at 9:06 a.m.)

3            THE COURT:  Good morning.  We are on the record in

4    United States of America versus Jon M. Hallford, case number

5    24-cr-113-NYW-1.  I'm United States District Judge Nina Wang.

6    Counsel, would you enter your appearance and introduce anyone

7    who is seated at the table with you.

8            MR. NEFF:  Yes, Your Honor.  Good morning.  Tim Neff

9    appearing on behalf of the Government.  Seated with me at

10   counsel table is co-counsel Craig Fansler.  Also with me at

11   counsel table is Special Agent Andrew Cohen with the FBI, and

12   Chris Adams, special agent with Colorado Bureau of

13   Investigation.

14           THE COURT:  Good morning.

15           MS. SUELAU:  Good morning, Your Honor.  Laura Suelau

16   on behalf of Jon Michael Hallford, who is present in custody.

17   Also at counsel table is Amanda Carroll, federal public defender

18   investigator, and Laura Ownby, federal public defender intern.

19           THE COURT:  Good morning.  All right.  The Court notes

20   that Mr. Hallford is present in person with his counsel.

21   Counsel, are you ready to proceed?

22           MR. NEFF:  Yes, Your Honor.  We are.

23           MS. SUELAU:  Yes, Your Honor.

24           THE COURT:  The record reflects that the defendant was

25   charged by indictment on April 10th, 2024, that's docket entry

                    Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    number one, on 15 felony counts, comprised of 13 counts of wire

2    fraud and aiding and abetting, and two counts of conspiracy to

3    commit wire fraud.  The defendant made his initial appearance on

4    April 15th, 2024.  It's docket entry number six.  And he was

5    arraigned on April 18th, 2024.  It's docket entry number 16.  At

6    that time, he entered a plea of not guilty as to each of these

7    counts.

8         On September 12th, 2024, defendant filed with this

9    Court a notice of disposition.  That's at docket entry number

10   40.  On October 24th, 2024, Mr. Hallford appeared before this

11   Court for a change of plea hearing, during which he withdrew his

12   plea of not guilty as to count 11 of the indictment charging the

13   conspiracy to commit wire fraud, in violation of 18 USC Section

14   1349, tendered a plea of guilty to that count, and was adjudged

15   guilty of count 11.  That's docket entry number 51.

16        The Court indicated that it would reserve the issue as

17   to whether to accept the plea agreement that was made pursuant

18   to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure

19   that binds the Court to a particular sentencing -- sentence or

20   sentencing range if accepted after review of the presentence

21   investigation report.

22        The United States probation office filed the

23   presentence investigation report on February 20th, 2025.  That's

24   at docket entry number 73.  After review of the presentence

25   investigation report, by order dated February 24th, 2025, the

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Court informed the parties that it intended to reject the plea

2    agreement that had been made pursuant to Rule 11(c)(1)(C).

3    That's docket entry number 79.

4        That minute order set a hearing for March 4th, 2025,

5    and indicated that Mr. Hallford should be prepared to either

6    withdraw from the plea agreement or proceed pursuant to Rule

7    11(c)(1)(B).  On March 4th, 2025, Mr. Hallford appeared before

8    the Court for a status hearing, during which the Court made

9    formal findings about the proposed plea agreement and rejected

10    it.  That's docket entry number 84.

11        Mr. Hallford informed the Court that he intended to

12    move forward with his guilty plea as to count 11, and the United

13    States and Mr. Hallford executed a plea agreement supplement

14    indicating such.  That's docket entry number 85.

15        The purpose of today's hearing is for me to determine

16    the sentence for count 11.  Mr. Hallford, is there anything

17    about your condition today that would make you unable to

18    understand what's going on?

19        THE DEFENDANT:  No, Your Honor.

20        THE COURT:  And during this proceeding, at any time if

21    you need to speak with your attorney, you can let me know, and

22    we will make those necessary arrangements.  All right?

23        THE DEFENDANT:  Yes, Your Honor.

24        THE COURT:  Ms. Suelau, have you and your client read

25    and discussed the presentence investigation report that's docket

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    entry number 64, the revised presentence investigation report

2    that's docket entry number 75, and then there are three

3    addendums thereto which are at docket entry 80 -- sorry --

4    docket entry number 74 is the first addendum, docket entry

5    number 111 is the second addendum, and docket entry number 114

6    is the third addendum?

7              MS. SUELAU:  Yes, Your Honor.

8              THE COURT:  Ms. Suelau, I understand that the

9    defendant has many objections to the PSR, but none of them

10   impact the calculation of the advisory guidelines; is that

11   correct?

12             MS. SUELAU:  Yes, Your Honor.

13             THE COURT:  All right.  And so let me go through the

14   categories of objections, and I'd like to understand what's

15   still at issue that we need to resolve today.  With respect to

16   the categories of objections, I understand that paragraphs 47,

17   53, 60, and 79 all pertain to Mr. Hallford's objection to the

18   characterization that he and his codefendant and wife, Carie

19   Hallford, evaded or attempted to evade law enforcement; is that

20   right?

21             MS. SUELAU:  Yes, Your Honor.

22             THE COURT:  Paragraphs 49 and 65 pertain to

23   Mr. Hallford's objection to the assertion that there may be

24   additional unaccounted-for victims that were water cremated,

25   destroyed with lye, or otherwise disposed; is that correct?

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    MS. SUELAU:  Yes, Your Honor.

2    THE COURT:  Paragraphs 57 and 49 pertain to

3    Mr. Hallford's objection to the description of the cremation

4    process.

5    MS. SUELAU:  That's 57, Your Honor, and 49.

6    THE COURT:  I'm sorry.  Fifty-seven and 49.  I thought

7    that's what I said.

8    MS. SUELAU:  Yes.

9    THE COURT:  Paragraphs 84, 69, and 77 pertain to

10   Mr. Hallford's objection to the loss amount stipulated by the

11   parties -- loss amounts beyond what's stipulated to by the

12   parties in the plea agreement?

13   MS. SUELAU:  Yes, Your Honor.

14   THE COURT:  Paragraphs 45, 48, 49, 57, 62, 64, 66, 67,

15   and 110 all pertain to Mr. Hallford's objections to certain

16   factual statements contained in those paragraphs?

17   MS. SUELAU:  Yes, Your Honor.

18   THE COURT:  And then finally, Mr. Hallford objects to

19   the imposition of a special condition of supervised release

20   number seven, which includes an occupation restriction that

21   includes, quote, a body broker business, because he contests and

22   alleges that he never engaged in the business of being a body

23   broker, and he has never engaged or profited from the illegal

24   sale of human remains; is that right?

25   MS. SUELAU:  Yes.

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    THE COURT:  All right.  Then, Mr. Neff, it appears

2  that the Government also filed objections to the PSR, and I

3  believe one may remain after the revision of the PSR, which

4  deals with whether or not the $15,000 of EIDL advances should be

5  part of the restitutionary amount; is that right?

6    MR. NEFF:  That's correct, Your Honor.

7    THE COURT:  Okay.  All right.  And then my

8  understanding is that the other two issues that pertain to

9  whether or not the interest should be included in the amount of

10  loss for the purposes of the calculation of the base offense

11  level and the offense level as well as whether or not any civil

12  judgments would or could offset the liability for restitution

13  here, both of those have been resolved in the revised PSR; is

14  that right?

15    MR. NEFF:  Yes.  That's my understanding.

16    THE COURT:  All right.  So, let me understand whether

17  or not the Government wishes to present evidence as to any of

18  the disputed issues with respect to the PSR?

19    MR. NEFF:  No, we don't, Your Honor.

20    THE COURT:  And does the defense wish to present any

21  evidence as to the disputed issues in the PSR?

22    MS. SUELAU:  No, Your Honor.

23    THE COURT:  Now, let me also understand, we received

24  the third addendum to the presentence investigation report,

25  which was the updated restitution which details specific payees

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  for which restitution is sought.  That total amount is

2  $193,966.18.  That remains unchanged.  And is that stipulated to

3  by the parties?

4           MR. NEFF:  Yes.  I believe it is, Your Honor.

5           MS. SUELAU:  Yes, Your Honor.

6           THE COURT:  Okay.  All right.  So, then let's turn to

7  the issues with respect to the disputed categories, Ms. Suelau.

8  So, with respect to paragraphs 47, 53, 60, 79, that pertain to

9  the characterization that they evaded or attempted to evade law

10  enforcement, my understanding is that the defendant doesn't

11  necessarily object to the facts as stated, but he objects to the

12  characterization that those facts should lead to the inference

13  that he attempted to evade or evaded law enforcement; is that

14  right?

15           MS. SUELAU:  That's correct, Your Honor.  With the

16  exception of the facts omitted -- I guess we object to the facts

17  that were omitted from the warrant, which was cited to in the

18  presentence report, but other than that, the objection is

19  essentially to the conclusion that those facts without

20  additional facts as provided in the objection would lead to the

21  conclusion that Mr. Hallford attempted to evade law enforcement.

22           THE COURT:  All right.  So, the Court, because the

23  objection -- the facts that are included in the PSR are not

24  objected to, based on the factual content, the Court determined

25  that no finding is necessary regarding the objection as to the

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   character -- characterization of those facts.  The Court can

2   draw its own reasonable inferences, does not take necessarily

3   the inference that is drawn by the PSR as fact, and will not

4   take into account that characterization in imposing a sentence.

5   Any further argument with respect to that category of objection?

6        MS. SUELAU:  No, Your Honor.

7        THE COURT:  Okay.  Then paragraphs 49 and 65 pertain

8   to Mr. Hallford's objection that there was assertion that there

9   may be additional unaccounted-for victims who were water

10  cremated, destroyed with lye, or otherwise disposed of.  And

11  again, it appears that Mr. Hallford's objections are not -- do

12  not pertain to the factual statements of whether or not the

13  materials such as lye or a water machine were found, but that

14  the objections were to the inferences that were drawn in the PSR

15  from those facts.  But the revised presentence investigation

16  report, as I understand it, reflects Mr. Hallford's position

17  with respect to those issues; is that correct?

18        MS. SUELAU:  Yes, Your Honor.  And I have no

19  additional argument on those issues.

20        THE COURT:  All right.  So, again, the Court

21  determines that no finding is necessary to those objections,

22  because the disputed or objected-to conclusion will not be taken

23  into account in imposing a sentence.  However, the Court can

24  draw its own reasonable inferences from those uncontested facts.

25  The Court notes that there are victim statements from customers

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    of Mr. Hallford, his codefendant, and Return to Nature that

2    indicate that beyond the weight of the remains or cremains given

3    back to the loved ones, that they -- there were certain victims

4    who indicated that they received cremains that were inconsistent

5    with the physical characteristics of their deceased loved ones

6    that would remain intact after cremation, such as a dental

7    bridge for an individual who no longer had any teeth and was not

8    cremated with his dentures.

9         That might suggest or may be the basis to draw an

10   inference that there may be other victims of the wire fraud that

11   would not be able to be identified because of the status of the

12   remains.

13        Paragraphs 57 and 49 pertain to Mr. Hallford's

14   objection to the description of the cremation process.  Again,

15   Mr. Hallford's objections will not be -- or those types of

16   statements will not be taken into account in imposing the

17   sentence, and so therefore the Court determines that no finding

18   is necessary with respect to his objections to the description

19   of the cremation process.

20        Now, paragraphs 84, 69, and 77 pertain to

21   Mr. Hallford's objections to loss amounts not stipulated to by

22   the parties in the plea agreement.  My understanding is the

23   $15,000 of the EIDL loan advances does not impact the -- does

24   not impact the calculation of any advisory guidelines, and the

25   parties have stipulated to the loss amounts that are contained

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   in addendum -- the third addendum; is that correct?

2          MR. NEFF:  Yes.  That is correct, Your Honor.

3          MS. SUELAU:  Yes, Your Honor.  The objection is that

4   the interest from those loans should not be counted.

5          THE COURT:  As part of restitution?

6          MS. SUELAU:  As either part of loss or part of

7   restitution.

8          THE COURT:  Okay.  So, what is the Government's

9   position with respect to interest as being part of the

10  restitution amount?

11         MR. NEFF:  Well, we cited the relevant case law.  Our

12  position is we had agreed not to seek the restitution off of the

13  COVID money, 119,000 or so plus.  So, we are not seeking that at

14  this time.  Legally speaking, I believe the Court would have the

15  right to impose that as part of restitution.  The interest can

16  be included in restitution.  We cited the cases on that, but we

17  are not seeking it.

18         THE COURT:  All right.  So, the Court will not include

19  that interest amount, only because the Government has indicated

20  that it has no witnesses to present.  The Government bears the

21  burden of establishing what restitution amount may be ordered.

22  Restitution may only be ordered for losses actually resulting

23  from the offense of conviction.  That's *United States versus*

24  *West*, 6467 -- I'm sorry -- F.3d 745, 751, Tenth Circuit, 2011.

25         The Government bears the burden of proving the amount

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    of loss by a preponderance of the evidence.  That's *United*

2    *States versus Galloway*, 509 F.3d 1246, 1253, Tenth Circuit,

3    2007.

4            It bears that same burden regarding the subordinate

5    question of what harms are properly included in the loss

6    calculation, because they're the result of an offense.  That's

7    *United States versus Anthony*, 942 F.3d 955, 964, Tenth Circuit,

8    2019, citing *United States versus Wells*, 873 F.3d 1241, 1265,

9    Tenth Circuit, 2017, quoting 18 USC Section 3664(e).

10           In light of the fact that the Government has not

11   presented any additional evidence, and that amount is not

12   contained in the third addendum to the presentence investigation

13   report that is stipulated, the Court finds that the Government

14   has failed to carry its burden of proof with respect to

15   including the interest amount in the amount of restitution, and

16   accordingly, the Court will not include that in its calculation

17   of restitution.

18           In addition, for the same reasons, the Court will not

19   include the amount of $15,000 of the EIDL advances as part of

20   the restitution or the part of the amount of loss, for the same

21   reason that there has been no additional evidence that has been

22   presented by the Government, and the Court finds that the

23   Government has not carried its burden of proof as to those

24   amounts.  In so ruling, the Court makes clear that it is not

25   making a ruling that such amounts could not or should not be

13

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    included in the restitutionary amount, only that the Government,

2    in failing to present any additional evidence, has failed to

3    carry its burden.  So, that objection is sustained.

4        Anything with respect -- anything in addition --

5    anything in addition with that category of objections?

6        MR. NEFF:  Nothing for the Government.

7        MS. SUELAU:  No, Your Honor.

8        THE COURT:  Paragraphs 45, 48, 49, 57, 62, 64, 66, 67,

9    and 110 pertain to Mr. Hallford's objections to certain factual

10   statements contained in those paragraphs.  The first addendum,

11   which is docket entry number 74, indicates that the Govern -- or

12   the probation office has made notes in the revised PSR as to

13   Mr. Hallford's various objections to those paragraphs.  Anything

14   in addition that we need to address after the revision to the

15   PSR, Ms. Suelau?

16       MS. SUELAU:  Your Honor, we would just be asking for

17   paragraph 67 to be struck for the reasons outlined in the

18   objection.

19       THE COURT:  Is it 67 or 68 in the revised PSR?

20       MS. SUELAU:  One moment, Your Honor.  It's paragraph

21   68 in docket entry 110.  So, we're asking that be struck.

22       THE COURT:  All right.  What's the Government's

23   position with respect to that?

24       MR. NEFF:  No objection to that, Your Honor.

25       THE COURT:  All right.  So, the Court will sustain the

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   objection to paragraph 68 before the -- and we'll ask the

2   probation office to take that paragraph out before the

3   presentence investigation report is conveyed to the Bureau of

4   Prisons.  So, the objection to that is sustained.

5          With respect to Mr. Hallford's last objection to

6   special conditions of supervised release number seven, I think

7   that's most appropriately discussed and argued by counsel in the

8   context of addressing what the appropriate sentence in this case

9   would be.  Any objections to that procedure, Counsel?

10          MR. NEFF:  None.

11          MS. SUELAU:  I'm sorry.  In regard to special

12   condition seven, I believe that has been amended.

13          THE COURT:  Oh.  I apologize.  Let me look.  It has.

14   So, that has been resolved.  Thank you, Ms. Suelau.  All right.

15          Then I will note for the record that the Court accepts

16   all undisputed portions of the presentence investigation report

17   as its findings of fact with respect to sentencing.  So,

18   formally, the Court finds that no finding is necessary regarding

19   the objections to the presentence investigation report, because

20   the controverted matters have been addressed through the

21   revision of the report, will not be taken into account in

22   imposing sentence, or will not affect the sentence.

23          Neither the Government nor the defendant has challenged

24   any other aspect of the presentence investigation report.

25   Therefore, the remaining factual statements and guideline

15

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   applications are adopted as the Court's finding of fact

2   concerning sentencing.

3        The Court will also grant the Government's motion for a

4   one-level decrease based on United States sentencing guideline

5   section 3E1.1(b) for acceptance of responsibility.  That's

6   docket entry number 78.

7        Based on the Court's resolution of the disputed issues

8   and the granting of the Government's motion, it concludes that

9   the total offense level is 28.  Defendant's criminal history

10  category is one, which results in an advisory guideline range of

11  78 to 97 months, one to three years of supervised release, a

12  fine range of 25,000 to $250,000, and a special assessment of

13  $100.

14       I guess I formally find that the loss amount pursuant

15  to section 2B1.1(b)(1)(H) as calculated in the presentence

16  report paragraph 84 is not applicable, because the Government

17  has not established its burden of proof with respect to that

18  loss amount, and therefore should also be amended before the

19  presentence investigation report is conveyed to the Bureau of

20  Prisons.

21       Any other rulings that counsel believes that I need to

22  make before we move on?

23       MR. NEFF:  I don't believe so.  No, Your Honor.

24       MS. SUELAU:  Not for Mr. Hallford, Your Honor.

25       THE COURT:  All right.  According to Federal Rule of

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

 1   Criminal Procedure 32(i)(4), before imposing sentence the Court

 2   must provide the defendant's attorney, the defendant, and

 3   attorney for the Government an opportunity to speak, as well as

 4   giving the victims an opportunity to be reasonably heard.  As I

 5   understand it, Mr. Neff, we have a number of victims who wish to

 6   be heard during this proceeding; is that right?

 7              MR. NEFF:  Yes, we do, Your Honor.

 8              THE COURT:  All right.  And then, thank you.  If you

 9   could silence your telephones, the Court would appreciate that.

10   All right.  So, what we will do is, Ms. Suelau, you will have

11   the first opportunity to speak on your client's behalf as to the

12   sentence that you believe is appropriate in this case.  Then,

13   Mr. Neff, you will have an opportunity to speak with respect to

14   what the Government believes is appropriate.  Now, then I would

15   have the victims speak.  Mr. Neff, it doesn't matter to me

16   whether or not the victims go before you or go after you.

17              And then finally, Mr. Hallford, before the Court

18   imposes any sentence, you will have an opportunity to address

19   the Court, if you would like, but you have no obligation to

20   speak.  Does counsel have any thoughts with respect to the order

21   of presentation today?

22              MR. NEFF:  No, Your Honor.  I would anticipate, just

23   to let the Court know, after Ms. Suelau goes, having the victims

24   speak, and then I would plan to speak afterwards, just for

25   planning purposes for counsel and the Court.

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1          THE COURT:  That's fine.  Ms. Suelau?

2          MS. SUELAU:  May I confer with my client, Your Honor?

3          THE COURT:  You may.

4          MS. SUELAU:  That procedure is fine, Your Honor.

5    Thank you.

6          THE COURT:  All right.  Ms. Suelau?

7          MS. SUELAU:  Your Honor, in a recent letter from one

8    of the victim families to this Court, that individual said that

9    this sentencing -- Mr. Hallford's sentencing's today closes a

10   chapter for that family, and that after that, we, quote, will

11   reclaim our lives.  Today begins the process of truly moving

12   forward.  And for whatever else is said or argued at this

13   hearing, it's my and Mr. Hallford's hope that his acceptance of

14   responsibility and his acknowledgment of fault here will in fact

15   allow for that process -- that healing process to truly move

16   forward.

17          Many of the victims in their letters wrote about

18   Mr. Hallford's actions, that they interrupted or prolonged or

19   aggravated their grief process in the loss of their loved ones,

20   and clearly some of the grief over that loss has manifested, and

21   fairly so, in anger against Mr. Hallford.  And from the

22   beginning, Mr. Hallford has understood and acknowledged that

23   anger, acknowledged that grief, and taken whatever actions he

24   has at his disposal to help with that grief process.

25          He knows he was wrong.  He's admitted he was wrong.  He

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    doesn't now or has not offered any excuse for his conduct.  It

2    is, however, my job and this Court's role to ensure that his

3    conduct in this case is not sentenced solely on a place of grief

4    and emotion, but in a manner that is consistent with the law.

5    So, I want to start with addressing some of the Government's

6    arguments raised in their response to my filing and my request

7    for a sentence of 120 months, and that is our request today.

8         First, in regards to the role the state sentence has or

9    doesn't have or should or shouldn't play or that this Court

10    should or shouldn't give consideration, the Government

11    encourages this Court to not, quote, abdicate its authority to

12    the State for Mr. Hallford's treatment of the corpses involved

13    in this case, and should suggest that somehow this Court's

14    consideration of the fact of that case would be inconsistent

15    with federal law.  The Government goes on to say, the state

16    court judge may or is likely to commit error in that

17    Mr. Hallford could escape punishment altogether.  That list of

18    terrible hypotheticals is just not the reality here.

19         So, I want to back up and walk us through kind of the

20    procedure of this case, which is that back in November 2023,

21    Mr. Hallford was arrested and charged with 268 counts for money

22    laundering, forgery, theft, and abuse of a corpse.  Then the

23    Government here charged Mr. Hallford with 15 counts of wire

24    fraud.  I will also remind this Court that prior to 2020, those

25    abuse of the corpse charges were misdemeanor charges in

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Colorado.

2         And when they were revised to be felony charges, the

3    State of Colorado said, essentially, federal charges related to

4    the fraud aspect of these types of cases are not enough.  We

5    want to have our own type of crime that addresses the harm done

6    here.  And then -- but by charging Mr. Hallford after those

7    state charges here, the Government kind of implicitly said,

8    there's other conduct here not covered by the state.  And I

9    agree, there is some conduct here not covered by the state, most

10   notably the Small Business Administration fraud.

11        And I will point out that that -- the loss of the Small

12   Business Association -- Administration, SBA, drives a lot of the

13   guideline here.  And without that loss, Mr. Hallford's guideline

14   range would start at 51 months, but now the Government says that

15   these cases are actually identical harm, and this Court should

16   address the same harm as if the state prosecution doesn't exist.

17        But either this Court recognizes that there's two

18   separate sovereigns prosecuting Mr. Hallford for identical

19   conduct, and takes that into account as fairly called for by

20   5G1.3, or you say they're addressing different harms altogether.

21   And the Government proposes that it's both, that the answer

22   should be that this Court be blind to the fact of the state

23   prosecution and Mr. Hallford's plea of guilt in that case, but

24   also in Your Honor's sentence to capture the whole harm of both

25   cases in this sentence.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1      First, I don't think this -- it's fair to engage in

2  speculation about what will or will not happen in that case or

3  presume that a judge in another jurisdiction would commit error.

4  The reality is Mr. Hallford has pleaded guilty in that case.  He

5  is set to proceed to sentencing.  The sentence that the parties

6  have stipulated to is 20 years.  Mr. Hallford's conduct in this

7  case indicates that he is very unlikely to withdraw from that

8  plea agreement or take another path.  He has every intention of

9  proceeding to sentencing in that case.

10      But in any case, this Court shouldn't substitute its

11  own judgment for the State of Colorado, and instead should just

12  assume that Mr. Hallford has been charged, justice will be

13  effectuated in that Court in the way justice is designed to be

14  effectuated, and that the fact of those charges and the fact of

15  Mr. Hallford's plea in that case and his potential sentence in

16  that case is relevant when fashioning a sentence here.

17      Now, I want to be clear, I agree that the treatment of

18  corpses at the Penrose facility is relevant conduct here, and

19  I'm not asking this Court to ignore it, but there's no world in

20  which Mr. Hallford will escape punishment if Your Honor

21  prioritizes the crime we're actually here for.

22      The point is that this Court has to consider we are

23  asking for an above guideline sentence.  The Government is

24  asking for an above guideline sentence, and the question is what

25  number is appropriate?  And in fashioning that, this Court can't

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    and shouldn't ignore the charges in the state, and, you know,

2    what the Government is inviting the Court to do would be by

3    extension, for example, saying to this Court, you don't have the

4    authority to order a state run -- a sentence to run consecutive

5    or concurrent.  We just ignore that that is a thing altogether.

6           But United States versus Stetzer -- or Setzer addressed

7    this question in another way, and this Court's authority and

8    consideration in another way by saying because in that case both

9    Mr. Setzer and the Government argued that because district

10   courts can't possibly know what might happen in an anticipated

11   state sentence, then they might get their sentence wrong,

12   essentially.

13          And the Tenth Circuit rejected that argument and said

14   no, we entrust district courts to impose a sufficient but not

15   greater than necessary sentence in consideration of state

16   sentences, even when they're anticipated.  And *Setzer* also

17   addressed the kind of fear mongering by the Government about

18   what the state will or will not do or may or may not mess up,

19   and said in our American system of dual sovereignty, each

20   sovereign, whether federal or state, is responsible for the

21   administration of its own justice system.

22          And so in fashioning a sentence, Your Honor has to

23   trust that -- consider that Mr. Hallford is facing those charges

24   and trust that that sovereign will administer its own justice

25   system, and instead focus here on the crime Mr. Hallford is

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   charged with and committed in violation of federal law, which is

2   wire fraud.

3          I also want to address the Government's disparity --

4   their response to my disparity analysis.  And it boils down to

5   them essentially saying there's only one case this Court should

6   consider for the purposes of disparity, and that's United States

7   versus Hess, but in so doing, the Government is making a few

8   explicit and implicit assertions that this Court should not

9   follow.  First, the Government's essentially saying that cases

10  involving funeral homes and the mistreatment of corpses are the

11  most egregious wire fraud, and so that all other sentences

12  sentenced under 2B1.1 are less serious, and these fall into

13  their own category.

14         But that requires this Court to make some moral and

15  religious judgment about, you know, what conduct -- egregious

16  conduct is or isn't worse than other egregious conduct.  And I

17  think the point of the cases I highlighted was to say there was

18  harm done here.  There was more than monetary harm done here,

19  and how do Courts look at a fraud case when there's more than

20  monetary harm done here?  But I don't think it's fair to

21  conclude this type of case is necessarily the most egregious of

22  all wire fraud cases.

23         I will use a case called *United States versus Castaldi*,

24  743 F.3d 589, that's Seventh Circuit, 2014, as an example.  And

25  there the district court in Mr. Castaldi's sentencing for wire

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  fraud read out loud and summarized letters from victims about

2  how he had deprived them of their life savings, college money

3  for children, money saved for retirement, money for medical

4  care, life insurance money, and one of his last victims

5  described how he convinced her to take a 200,000-dollar mortgage

6  out on her home and invest it with him.  That money is lost.

7  Her home is lost, and she's an elderly woman left destitute.

8         The cases I cited in my filing also implicate people's

9  medical decisions, the targeting of elderly people on fixed

10 incomes, elected officials who sold their power for influence in

11 the United States jeopardizing security interests.  Each of

12 those cases, what's different about those is although we have

13 that aggravated harm, each of those individuals also lived

14 lavish lifestyles, by contrast to Mr. Hallford, who was living

15 very much a middle class life, renting a three-bedroom home for

16 his family in Colorado Springs.

17        But they were all living lavish and extravagant

18 lifestyles, and many of those individuals refused to accept

19 responsibility, and all of those individuals have a higher

20 applicable guideline range, yet each of them received a sentence

21 less than 180 months.  So, I just don't think it's accurate to

22 say the harm here is worse than all that harm.  They both

23 involve significant harm above and beyond what we typically

24 think of for wire fraud, but this Court should reject the notion

25 that this type of conduct is necessarily more harmful than that

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    other type of harm.

2          The second assumption the Government would like this

3    Court to make is that the only marker this Court should consider

4    is the Hess case, and says these cases were all but identical.

5    As I noted in my filing, there are several significant

6    differences with the Hess case: greater loss to victims and

7    customers, the length of the scheme, and the secondary profit of

8    the body-brokering business.

9          I know the Government said something along the lines

10   of, you know, we don't know when Mr. Hallford would have ended

11   this just because he was arrested, but we don't sentence people

12   based on conduct they might have -- they might commit in the

13   future or might have committed in the future but for the arrest.

14   I mean, that's true of any case; right?  We sentence for what

15   people actually did, but the critical difference with the Hess

16   case is the body-brokering aspect.

17         First, that is evidence of a more contrived scheme on

18   behalf of Ms. Hess.  In other words, she always knew that she

19   would not return the remains to loved ones.  She set up an

20   organization for that purpose.  She always knew she intended to

21   sell those body parts for profit, versus Mr. Hallford, who did

22   execute legitimate services for many customers, over 900

23   customers, and did not set up a funeral home for the purpose of

24   engaging in another separate illegal activity.

25         He also did not profit twice from his business.  And

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1  not in small part, the Hesses' conduct eliminated any

2  possibility that the victim families in those cases could

3  eventually have their loved ones back and find closure.  The

4  bodies were simply gone.  And Ms. Hess and Ms. Koch never faced

5  any penalty in the State of Colorado.  When they committed that

6  conduct, it was misdemeanor conduct, and they were not charged.

7  Mr. Hallford is facing the significant sentence in the State.

8          But finally, even if you say, okay, the Hess case is

9  the only case, at her resentencing, Ms. Hess' applicable

10  guideline range was 121 to 151 months.  Therefore, her 240-month

11  sentence, which was 89 months above that, was a 59 percent

12  increase from the top of the applicable guideline range.

13          The Government's requested variance here, 83 months

14  above 97 months, is an 86 percent increase above the top of the

15  applicable guideline range.  So, that would, I think, implicitly

16  mean that Mr. Hallford's conduct was worse, and it deserves a

17  greater increase.  An 86 percent increase, as Your Honor knows,

18  is extraordinary in cases -- you know, by comparison, in cases

19  where an individual comes in, cooperates with the Government,

20  testifies in front of a jury, at risk to themselves, their

21  safety, their family, those individuals, the Government says get

22  maybe up to at most a 30 percent decrease.

23          So, when we're looking at what percentage do we go

24  above or below the guidelines, I think that's a good anchor for,

25  okay, this is an extraordinary in the other direction, and

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1    that's still only up to 30 percent.  In reverse, we have

2    86 percent above the applicable guideline range?

3           But we also have a final problem with the Government's

4    position that Hess should be this Court's only anchor, and that

5    is that the Government presumes the sentence in Hess was

6    reasonable, and says, essentially, notwithstanding the appeal,

7    even if -- that only one data point should be considered

8    reasonable, and that data point is Judge Arguello's judgment,

9    and that this Court should do that -- rely on that,

10    notwithstanding the appeal, not knowing the fullness of the

11    3553(a) factors considered in that case, and assuming -- saying

12    yes, I agree, Judge Arguello's sentence that was 13 -- 13 years

13    for Ms. Koch and 18 years for Ms. Hess, higher than the national

14    average for fraud, is the appropriate anchor.

15           But the whole purpose of the sentencing guidelines was

16    to bring some uniformity to sentencing to avoid that kind of

17    wild disparity, and that's why guidelines are the benchmark and

18    should be the benchmark in federal sentencing, or are the

19    benchmark pursuant to the Supreme Court jurisprudence, not the

20    judgment of one individual judge.

21           And so the Government's encouragement of this Court to

22    ignore all the other data that Mr. Hallford has presented

23    presents a problem.  And what if for example in the future

24    Mr. Hallford -- the Hess sentence and the Koch sentence are

25    overturned?  Then what happens with that singular data point?

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    The data that we actually have about fraud sentences

2  tell us that someone with Mr. Hallford's criminal history

3  category, with Mr. Hallford's offense level, renders most people

4  at an average of 61 months.  We're not asking for 61 months.

5  We're recognizing the harm here.  We're asking for twice that

6  national average, but three times that average is greater than

7  necessary.

8    Finally, in their response, the Government talks about

9  how essentially, because Mr. Hallford has acknowledged that this

10  case is outside the heartland of the traditional fraud case,

11  then it must necessarily be 180 months.  It's true, this is

12  outside the heartland of a traditional fraud case, but that

13  doesn't just mean once we're outside of the guidelines we're

14  completely unreined or unbridled by any consideration of them or

15  any consideration of similar conduct.  It's just saying, this is

16  an aggravated case as compared to the average case.

17    Again, the average is 61 months.  So, the guidelines,

18  which have repeatedly been found to already be inflated, put us

19  at a top of 97 months, and we're saying 23 months above that is

20  the appropriate mark.  The Government is saying nine years above

21  that is the appropriate mark.  That's greater than necessary.

22    I just want to briefly address Mr. Hallford's history

23  and characteristics, because for whatever else the victim

24  families may think about Mr. Hallford, and fairly so, that's --

25  this case is not the whole of who he is or the whole of his

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  history and characteristics.  He is also a father who will not

2  see his children meet many milestones such as graduations,

3  weddings, things of that nature.  He is a husband who will not

4  see his wife for a decade or more.  He is a son who received

5  news yesterday that his father is likely to die in the next few

6  days of Alzheimer's, and he will not be there for that death or

7  to comfort his mother or anything like that.

8      He will likely miss also the death of his mother in the

9  next ten years.  He's a brother.  He's a friend, and he is

10  beloved by people.  And no matter how heinous this conduct was,

11  those are still relevant considerations for Your Honor when

12  imposing a sentence.

13      I think it's also relevant to consider that

14  Mr. Hallford has been publicly shamed, ridiculed, and disgraced.

15  He's lost his career.  He's lost his reputation.  People have

16  made life-sized voodoo dolls in his likeness.  There's

17  documentarians and podcasters and newscasters who all think they

18  know him and are talking about how evil he is.  That is what he

19  is going to be living with, that consequence as well.

20      And he certainly did reprehensible things.  He

21  acknowledges that.  But he did not start Return to Nature, this

22  business, with the purpose or the intention of doing those

23  reprehensible things.  He made some awful decisions over the

24  course of four years, but he's still a human being.  And he's

25  still a human being who spent the first 40 years of his life

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   living a law abiding life, being a husband, a father, a son, all

2   of those things.

3          But he will spend whatever sentence Your Honor imposes,

4   the rest of his life defined by this four-year period.  So, the

5   question is in addition to this 20-year state sentence, how long

6   does Mr. Hallford need to spend in federal prison?  And it's our

7   position that 120 months properly reflects all those things and

8   finally reflects the fact that he has accepted responsibility

9   here.

10         He's not eschewed blame.  He's not pointing fingers.

11  He's not minimizing.  He's contrite.  He's accepting from the

12  beginning.  He has been consistent in his message to me, which

13  is, I don't want to do any more harm here.  I want to accept

14  responsibility.  I know I was wrong.

15         He read every single letter submitted to this Court

16  from the victims.  He knows the harm he's caused.  He's

17  intimately familiar.  He knows everything they think about him,

18  and he accepts all of that.  That's even more remarkable in

19  light of the fact that he was essentially told, you could be

20  facing five years more than you initially thought when you

21  entered the plea of guilt, and he still said, that's okay.  I

22  don't want to re-victimize these families.

23         He's accepted everything that has come his way, and he

24  gets it.  So, in light of that, 120 months reflects all of those

25  things and is the appropriate but not greater than necessary

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    sentence in this case.

2        We're also asking Your Honor to recommend designation

3    at either El Reno FCI or Texarkana.  Those facilities are within

4    driving distance from his family, and they also offer UNICOR and

5    other rehabilitative programming.

6        Unless Your Honor has any questions, I have nothing

7    further.

8        THE COURT:  Thank you, Ms. Suelau.  All right.

9    Mr. Neff, I have a list of individuals who would like to be

10   heard.  Will you just be calling them one by one?

11       MR. NEFF:  Yes.  If I could, Your Honor?  I would note

12   for the Court there has been some modification.  There were a

13   handful of people who could not travel here or be here, so we

14   may have to strike a couple names.  I also would like to note

15   there were two additional people who did show up and are asking

16   to be heard.  I would ask leave of the Court to include them.  I

17   just received notice basically yesterday, one this morning, but

18   we are dropping three, and I'm asking essentially to add two, I

19   think is what it will be.

20       THE COURT:  That's fine.

21       MR. NEFF:  Okay.  With that said, Your Honor, if I

22   could -- if I could call the first victim who would like to

23   speak?  And that would be Crystina Page.  Ms. Page, if you could

24   come up here, please.  Thank you.

25       THE COURT:  All right.  For all of the victims who

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    would like to be heard, it would be helpful when you come to the

2    podium after Mr. Neff states your name for you to state your

3    name and spell it so our court reporter can accurately record

4    it.

5         MS. PAGE:  Give me ten seconds, please, Your Honor.

6    Good morning, Your Honor.  Thank you again for hearing us.  We

7    appreciate it.  My name is Crystina Page, and I stand before you

8    today not just as a grieving mother, but as one voice among

9    thousands forever altered by the actions of Return to Nature

10   Funeral Home.

11        THE COURT:  Okay.  Ms. Page, I'm going to stop you.

12   Just say your name, and spell it for our court reporter.

13        MS. PAGE:  I'm sorry.  Crystina Page.

14   C-R-Y-S-T-I-N-A, P-A-G-E.

15        THE COURT:  Thank you, Ms. Page.  Go ahead.

16        MS. PAGE:  Thank you.  I stand before you today not

17   just as a grieving mother, but as one voice among thousands

18   forever altered by the actions of Return to Nature Funeral Home.

19   What happened here is more than fraud.  It's desecration, it's

20   trauma, and it is a betrayal so deep that no sentence will ever

21   fully balance the scales.

22        I speak today not only for my son, David Jaxon Page,

23   but for every person whose final moments were denied dignity and

24   for every family whose grief was manipulated and multiplied.

25   The numbers are staggering, but the numbers alone don't show the

32

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   weight of what was done.  So, I offer a visual, and I'm asking

2   Beth, who is a co-victim and now friend, to step forward and

3   help me with this very quickly.

4        This is 191 beads that represent the 191 that were

5   found in the building, but the 191 found were only the bodies.

6   In addition to those 191 bodies, there are thousands of people

7   who have been affected by the finding of those.  And

8   unfortunately, the 191 found were not the only affected.  The

9   number we've been given is 1,178 clients of Jon Hallford's.

10  That means there's roughly 987 people still not represented in

11  the system.

12      (Pause in the proceedings.)

13       MS. PAGE:  And along with those 987 are the thousands

14  of people affected by those bodies who were not accounted for.

15       Is wasn't just the 191 that were left in that building.

16  This is a community forever changed.  It wasn't just 191 people

17  affected.  Every single person who loved my son, who loved my

18  friend's children, brothers, sisters, mothers, fathers,

19  grandparents, grandchildren, and cousins, our community will

20  forever be changed by the actions of Jon Hallford, and there is

21  no sentence that could possibly be enough.  Thank you again,

22  Your Honor, for hearing us.

23       THE COURT:  Thank you, Ms. Page.

24       MR. NEFF:  Your Honor, at this time the Government

25  would ask that Cori Cusack-Sperry please step forward.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1        THE COURT:  So, before you start, your name and the

2   spelling, please.

3        MS. CUSACK-SPERRY:  Thank you, Your Honor.  My name is

4   Cori Cusack-Sperry.  C-O-R-I, C-U-S-A-C-K, S-P-E-R-R-Y.  My

5   mother was Barbara Jean Cusack.  She died on November 21st,

6   2019.  Her body was among the first to be dumped at the Penrose

7   building.  She was there for nearly four years.  It's difficult

8   to quantify the amount of generational trauma inflicted by the

9   intentional negligence perpetrated by Jon Hallford.  My mother

10  was my best friend.  We did everything we could to honor her

11  final wishes, only to discover that Jon Hallford desecrated her

12  remains and destroyed all of our good intentions.

13        Although I felt extreme grief and anger, I could not

14  focus on myself, because my son, who adored his grandmother,

15  quickly spiraled into deep depression.  It was only after

16  spending thousands of dollars on a hospital visit, therapy, and

17  counseling, and ultimately an emotional support dog that my son

18  finally began to heal from his anger and sadness.  Everyone in

19  my family was deeply traumatized by this situation.  I believe

20  the longest jail time possible is warranted for Jon Hallford due

21  to his callous and thoughtless treatment of all of our beloved

22  family members who entrusted him.

23        Rather than treating the deceased with care and

24  consideration, he was discarding their bodies like trash, and

25  then using the funds intended to properly lay them to rest for

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    his own personal enjoyment and enrichment.  When the

2    investigation first began, he lied to law enforcement officers

3    and then fled.  At no time since his arrest has he publicly

4    shown an ounce of remorse or regret, nor has he ever attempted

5    to help families as they desperately tried to find out where

6    their loved ones' bodies were left.

7            At what point has he showed contrition?  Where has he

8    made amends?  I personally think he should be locked up for the

9    rest of list life.  Your Honor, please do not give Jon Hallford

10   any special treatment or consideration.  He deserves the same

11   lack of consideration and indifference that he showed to the

12   hundreds of families that he victimized.

13           THE COURT:  Thank you, Ms. Cusack-Sperry.

14           MR. NEFF:  Your Honor, I believe in addition there

15   will be -- the Government would like to call Colton Sperry, who

16   I believe is the son of Ms. Cusack-Sperry.

17           THE COURT:  Colton, if you can say your name, and

18   spell your name.

19           MR. SPERRY:  Hello, Your Honor.  My name is Colton

20   Sperry.  C-O-L-T-O-N, S-P-E-R-R-Y.  My grandma was Barbara Jean

21   Cusack.  She died on November 21st, 2019.  My grandma was like a

22   second mom to me.  We were so close, and I loved her so much.

23   When I found out that Jon Hallford left her body in that

24   building for years, I became very angry, sad, and depressed.  It

25   got worse after I decided to go to a witness cremation, because

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    I wanted to make sure they were doing what they told us they

2    would do with her body this time.

3            I felt like my grandma died for a second time, but this

4    time it was so much more worse, because she was treated so

5    badly.  I miss my grandma so much, and I felt so sad for her

6    that I told my mom if I died too, I could be with my grandma in

7    Heaven and talk to her again.  I lost trust in everyone and

8    cried almost every day.  My mom and dad were so worried about me

9    that they took me to a hospital for a mental health check.

10           The physiologist at the hospital recommended that our

11   family got counseling through Judi's House to help me in my

12   grief.  I went to counseling for several months, but didn't get

13   really any help that helped me.  My parents ended up spending

14   several thousand dollars on an emotional support dog for me.

15   This dog, my dog Twinky is the only thing that actually helps me

16   feel better when I am sad or mad about what happened to my

17   grandma.

18           Please give Jon Hallford the longest sentence possible,

19   because he hurt hundreds of people.  He could have used that

20   money to do the right thing, but he didn't care about any of the

21   victims nor their families.  He chose to leave those bodies in

22   that building and rot to spend the money on himself.  Jon

23   Hallford deserves the full sentence.

24           THE COURT:  Thank you.

25           MR. NEFF:  At this time, the Government would also

24-cr-113-NYW-1      Sentencing Hearing      06-27-2025

1    ask, is there a Derrick Johnson here who would like to make a

2    statement?

3              MR. JOHNSON:  Hello, Your Honor.  My name is Derrick

4    Johnson.  D-E-R-R-I-C-K, J-O-H-N-S-O-N.  In one of the most

5    grotesque discoveries in modern American funeral history, 191

6    human bodies were left to rot in filth, stacked, decaying,

7    melting into one another in a building that became a tomb of

8    lies.

9              My mother, Ellen Lopes, was one of them.  She was not

10   treated as a human being.  She was treated as waste.  They all

11   were.  As I said, my name is Derrick Johnson, and I've traveled

12   over 3,000 miles to be able to come here and give this impact

13   statement of how this affected me, my family, the community.

14   I'm a teacher, a coach, a husband, a father, and a son, the only

15   child of Ellen Lopes, whom we entrusted her final moments to the

16   care of a business that pretended to honor the dead while

17   instead desecrating them in ways that words fail to even

18   capture.

19             My mother was a pillar in Southern Colorado Springs, a

20   surrogate mother to many, a woman who would literally give her

21   last to anyone that had less, a traveler, a giver, a soul so

22   magnetic she built a family that spanned the globe.  Even more

23   so through social media.  She was surrounded by love when she

24   died on February 12th of 2023 in hospice.

25             We did everything right.  We made plans to honor her

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    last wishes to be cremated and have her ashes spread on Maui so

2    that she could watch over her only son and her grandchildren.

3    We paid for a cremation, and we trusted Return to Nature to

4    honor her wishes.  We took the fake ashes that they gave me,

5    which was really concrete powder, and we had a funeral.  We

6    planted a tree with that underneath it.  All of that means

7    nothing now.  There's no closure to anyone that knew her.  I

8    don't even think that's possible.  It's just a tree of lies now.

9         Within 30 minutes of her passing, Return to Nature

10   arrived and took her away.  That was the last time that she was

11   treated with any dignity.  From there she was driven to the

12   Penrose House of Horrors and rolled out like freight, discarded,

13   and thrown into a festering sea of death.

14        To this day, I lie awake at night wondering, was she

15   naked?  Was she stacked on top of others like lumber?  Was she

16   at the bottom, crushed by the weight of strangers in a similar

17   betrayal?  Did she rot in silence with her soul hovering above

18   in disbelief?  I torment myself with visions of her decomposing,

19   skin sloughing off, and liquid seeping into the floor, rats and

20   maggots feasting.  That house was literally hell.

21        These conditions meant nothing to the demented mind of

22   Jon, to the point that he could order burgers covered in

23   decomposition fluid.  I also wonder, if he could think of food

24   in a time like that, what else could he stomach?  This nightmare

25   was not a mistake.  It was calculated.  Jon and his wife, Carie,

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    made this their lifestyle, executing their sick plan again and

2    again and again, a minimum of 191 times.

3    And while the bodies rotted in secret, they lived, they

4    laughed, and they dined.  They traveled.  They bought luxury

5    vehicles, shopped in Vegas.  My mom's cremation money likely

6    helped pay for a cocktail, a day at the spa, a first class

7    flight.  They didn't use money for refrigeration, burials, or

8    dignity.  They used it to feed their appetite.

9    Even when handed a lifeline, COVID relief funds, they

10   didn't even stop.  They didn't try to make things right.  They

11   doubled down on the selfishness.  Not once did they or have they

12   shown reason or remorse, and their lack of these things is

13   almost as disturbing as the crime itself.  Not once did they

14   pause to consider the human cost.  I wonder if they prayed for

15   forgiveness even once, or did they only pray for more victims as

16   their cash ran low?

17   The fact that they enjoyed what they were getting out

18   of it to such a high degree that they wouldn't stop themselves

19   makes them sadistic, truly.  What they did wasn't just illegal.

20   It was inhuman, and it was soul-killing.

21   My trust in people has been shattered.  I walk around

22   with paranoia now, thinking everyone has a secret.  I needed

23   therapy, spiritual counseling, and medication, and still the

24   nightmares follow me.  I can't even enjoy movies, music.  Even a

25   Disneyland ride with my children, Pirates of the Caribbean, with

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    skeletons laying around everywhere, brought me to tears.  Hear

2    that again.  A mental breakdown in the happiest place on earth.

3    Everything reminds me of the grotesque truth.  October is

4    unbearable because of Halloween.  Decorations make me nauseous.

5         The only dream I've had of my mother since her passing

6    came the day they demolished that building.  She waved to me,

7    maybe good-bye, maybe hello, but since then only darkness.

8         This experience has ruined so much of who I was.  I am

9    not the same father, husband, or teacher that I was before.  I'm

10    haunted.  We all are.  And the saddest part is that this didn't

11    have to happen.  Jon and Carie chose this path.  They chose it

12    daily, and they monetized grief and made a mockery of death.

13         According to the Cambridge dictionary, "ruthless" means

14    not thinking or worrying about any pain caused to others.  That

15    word is not strong enough for what they are, but it fits.  They

16    were in a position of trust with our loved ones, and with

17    families at their most vulnerable, and they desecrated both of

18    them, one physically, and one mentally.

19         If justice means anything, if fairness still matters,

20    then for the 191 lives stolen from peace in that building, for

21    the hundreds of unknown victims, and for the thousands of

22    families that have been plunged into this trauma, for the total

23    absence of humanity in their actions, I ask the Court to impose

24    the maximum sentence possible.  Please let this be a reminder

25    and a statement of the future that death should be sacred, and

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

 1   those that violate that trust deserve no leniency.  Thank you.

 2          THE COURT:  Thank you, Mr. Johnson.

 3          MR. NEFF:  Cecilia Converse.  Is Ms. Converse here?

 4          MS. CONVERSE:  Cecilia Converse.  C-E-C-I-L-I-A,

 5   Converse, C-O-N-V-E-R-S-E.  I don't have a speech, and everyone

 6   has so eloquently explained the way all of us have felt.  I took

 7   my daughter, Amber Nichol Haines.  I trusted this business.  I

 8   was supposed to hear back in three days if I was even able to

 9   make the decision to have her cremated or not, and then of

10   course she would have to go to Denver.  And three days later, I

11   called, and she was already ready.  So, instantly, I knew

12   something was off.  And I -- obviously it's not something you

13   would ever even imagine that someone could do something like

14   that, take my beautiful child and just throw her in a pile.

15          And like he said, when you have thoughts of how many

16   people were on top of her?  Was she in a bag?  I mean, just --

17   it's just vile and disgusting, and I just want to make sure that

18   this individual gets at least 20 years.  I think that would be

19   the minimum.  Thank you.

20          THE COURT:  Thank you, Ms. Converse.

21          MR. NEFF:  Ms. Beth Gannon.  Is Ms. Gannon here?

22          MS. GANNON:  Thank you, Your Honor.  My name is

23   Elizabeth Gannon.  E-L-I-Z-A-B-E-T-H, G-A-N-N-O-N.  Your Honor,

24   thank you for allowing me to share my personal statement today.

25   Again, my name is Elizabeth Gannon.  My father's name is Edward

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Peter Lynch.  My mother's name is Darlene Christy Lynch.  In

2    addition to the obvious grief and heartbreak, I have tried to

3    come to terms with the abhorrence I feel knowing that

4    approximately 200 bodies were tossed without any empathy for the

5    grieving loved ones and the family members.  There was no

6    compassion shown towards each of the sacred bodies that were

7    once living and breathing human beings, and very loved people.

8        One of the most difficult feelings that I personally

9    cannot get past is the overwhelming feeling of shame and guilt,

10   because it was my choice to choose Return to Nature.  I

11   personally feel this overwhelming shame and guilt because as I

12   said, it was my decision and my decision alone to use the

13   services of Return to Nature for both of my parents.  My mom and

14   dad did not make that choice before they passed.  They didn't

15   choose Return to Nature.  I chose Return to Nature.  No other

16   family member made this decision.  Nobody else was involved.  It

17   was me alone.  It is my poor decision that caused this to happen

18   to my parents.  Simply myself.

19       When I initially learned of this heartbreaking

20   situation, I chose only to share the information with my husband

21   and no one else due to this, again, overwhelming guilt that I

22   feel of such a poor decision that I have made.  I didn't even

23   tell my two grown sons about what had happened to their

24   grandparents.  And it wasn't until later, when Alisha from the

25   FBI convinced me that I should do so, because sooner or later

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   they would figure it out, and they should really hear it from

2   me.

3          To this day, this very day, I still have not told my

4   sister what has happened.  She lives out of state.  She has no

5   idea what happened to our parents to this day.

6          Although I have a wide network of family and friends, I

7   have only told a small handful, possibly ten, that's it, that I

8   am personally affected by this case.  Of those small hand --

9   that small handful of people, each one of them has told me that

10  I shouldn't feel guilty.  I did nothing wrong.  That it's Jon

11  Hallford that did everything wrong.  He should feel guilty.

12         But I have to say, my feelings are my feelings.  My

13  feelings are the same today two years later as they were on day

14  one when I heard about this.  My feelings don't change based on

15  what somebody says to me.  My feelings are deep in my heart, and

16  they will not change.

17         Jon Hallford took nearly $900,000 of government funds

18  meant to help provide a much needed service following the

19  difficult COVID period, but it turns out he was not providing a

20  compassionate, reliable service.  He stole money from grieving

21  customers as well as the federal government to use for a selfish

22  luxury lifestyle.  He did this willfully and knowingly.

23         The horrific actions he engaged in has sentenced me to

24  a lifelong impact of guilt and mistrust.  Since I have to suffer

25  this sentence, it is only appropriate that Jon Hallford must

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   also suffer a lifelong sentence.  With all this being said,

2   despite the incredible weight that I care for allowing myself to

3   get involved and trust the people at Return to Nature, I refuse

4   to let Jon Hallford's action take over my life.  I will continue

5   to live a very fulfilled life with my husband, my children, and

6   my grandchildren.  This, Your Honor, Jon Hallford cannot take

7   away from me.  Thank you.

8        THE COURT:  Thank you, Ms. Gannon.

9        MR. NEFF:  Is Ms. Tanya Wilson here?

10        MS. WILSON:  Good morning, Your Honor.  My name is

11   Tanya Wilson.  T-A-N-Y-A, Wilson, W-I-L-S-O-N.  Excuse me for a

12   second.  Thank you for allowing me to speak before the Court

13   today.  I stand here on behalf of my mother, Yong Anderson, who

14   was one of the family members discovered in the Return to Nature

15   Funeral Home.  I'm also going to apologize up front, because it

16   seems like I have a lot to say.

17        For the past 20 months, I've had to sit in this anger

18   and in this unimaginable grief, trying to process this whole

19   nightmare.  There are a million words, but none seem big enough

20   to accurately describe this in a way where anyone who wasn't a

21   victim could possibly understand.

22        My mother was the strongest woman I know.  She was the

23   heart of our family.  She came to this country and worked three

24   jobs at any given time to support her children.  She was tough

25   and stubborn.  She was practical, the kind of woman who didn't

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    waste time complaining, because she didn't have that luxury.

2    But she loved us fiercely, and she loved her grandchildren with

3    that same no-nonsense devotion.  She hid away the scars from her

4    life and sacrificed for us to give us the life that she didn't

5    have.

6         So my mom deserved peace in death.  She deserved

7    dignity.  She deserved so much more than to be dumped into a

8    building left to rot, and she deserves for Jon Hallford to spend

9    the rest of his life in prison for it.  I remember very clearly

10   the day my mother died.  My brother and I were with her and held

11   her hands as she took her last breath.  In our culture, the way

12   a person is treated after death is important.  My brother and I

13   took this role very seriously, and we did our very best to honor

14   those traditions, to show her our love and our gratitude for

15   everything that she had done for us in life.

16        We bathed her.  We brushed her hair.  We put her

17   favorite moisturizer on her face.  We dressed her in a

18   traditional hanbok, but we added big soft socks, because her

19   feet were always cold.  We left her gold bracelet on her wrist,

20   the one that she had worn since I was a child.  And we tied a

21   norigae to her honbak for luck on her journey, white to

22   symbolize our grief.

23        My mom wanted her ashes to be released in the ocean in

24   Hawaii, so my brother and I, along with family and friends, flew

25   to Hawaii.  We chartered a boat, and we sailed off the coast of

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   Diamond Head as the sun was setting.  We released her into the

2   water while the gentle waves carried her away.  It was

3   beautiful, and it was perfect, and my mom would have loved it.

4   So, we honored our culture.  We honored her wishes.

5        We honored her, and then we made the mistake of

6   trusting Jon and Carie Hallford to do the same.  And now I'm

7   left horrified that it was all just a sick, twisted, and cruel

8   lie.

9        They came into my brother's house the day my mother

10  died.  They talked about sending her with the blanket that I had

11  made for her years ago.  They said they preferred to use

12  something personal to wrap her up in, something from home.  We

13  thought they were being thoughtful, but looking back, I now know

14  they were just saving themselves a body bag.

15       They also knew of our plans to release her ashes in

16  Hawaii, a place that meant something to her, and still, still

17  they looked us in the eye with a smile on their face, handed us

18  a bag of concrete, promising us that they took good care of my

19  mother.  What kind of monsters do you have to be to do something

20  like that?

21       Your Honor, I know we are here for wire fraud, but the

22  fraud went far deeper than their financial crimes.  The fraud

23  was just the vehicle that allowed them to keep deceiving

24  families, to keep hiding bodies, to keep turning death into

25  profit.  So, the name of the charge may be wire fraud, but the

Kevin P. Carlin, RMR, CRR

46

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   impact is so much more.  Every morning for over a four-year

2   period, the Hallfords woke up and made the calculated decision

3   to betray grieving families like mine.  They didn't even attempt

4   to rectify a fraction of the devastation they caused when they

5   spent the pandemic money on themselves.

6        And now, I can't even walk in a Home Depot anymore

7   without feeling like throwing up every time I see those plastic

8   storage totes they used to store the bodies in, of babies in.  I

9   can't even look at pictures of my mother anymore without my

10  thoughts being dragged back to Penrose, back to those mental

11  images of the stacked bodies and the odors.

12       Like Derrick said, I stay awake at night wondering,

13  which room was my mom in?  Was she on the floor?  Was she on one

14  of the tables?  Did she have other bodies stacked on top of her,

15  or was she the one that Jon Hallford shoved off the gurney into

16  inches of toxic fluids just so he could roll in the next loved

17  one to be lost and forgotten?

18       And I can't find that shelf in my mind or in my soul

19  where all of those thoughts and feelings belong.  There's no

20  place to set it down, because it consumes me, my thoughts, my

21  memories, and my dreams.  Jon and Carie Hallford didn't just

22  break the law.  They shattered lives.  They devastated thousands

23  of families.  Nearly 1,200 families entrusted their loved ones

24  to them.

25       So, just imagine if the ashes that held a sacred spot

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    in your home for years that you whispered your grief to may not

2    be your person, and that you will never know for certain.

3    Imagine not knowing if your loved one who was buried is actually

4    in that grave that you stood over and cried over.  The

5    Hallfords' greed and callousness has destroyed the trust of an

6    entire community who now looks at the entire industry with

7    suspicion.

8           I read their character letters from his mother, his

9    son, his friends, and they would like for you to see a good man,

10   a caring father, a remorseful son.  They say he's taken

11   accountabilities by pleading guilty, that he can be

12   rehabilitated.  But this isn't about his future.  This is about

13   justice for the victims.  Admitting guilt after being caught

14   isn't accountability.  Trying to flee the state after the

15   discovery of your crimes isn't accountability.

16          What defines a person isn't all the good things -- good

17   deeds that everyone can see.  It's what you do behind

18   everybody's back when you think no one is looking that reflects

19   who you truly are, and Jon Hallford has shown us who he truly

20   is.  He placed his greed over his own family over our families,

21   and he knew the consequences of his actions.  He even stated it

22   in one of his own texts about going to prison when he wasn't

23   joking about getting people juice on him right before he orders

24   lunch.

25          He chose to abandon his family, so it will be his fault

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   that he won't be there when his parents pass away or when his

2   son gets married.  He made those decisions.  He chose to abandon

3   his family when he chose to lie to grieving families and stuff

4   bodies into rooms to rot while handing out bags of concrete.

5           But what stood out to me the most in one of the letters

6   was the claim that he didn't kill anyone, that he didn't

7   physically harm anyone, so that somehow justifies a lighter

8   sentence.  But I will tell you that I wish he had physically

9   harmed me instead, because physical wounds can be healed, but

10  what he did, what they did, that can't be healed.  And yes, it's

11  true he didn't kill my mother, but he did annihilate her

12  dignity.

13          The bracelet that I mentioned, her favorite one that

14  she wore my entire life, the white norigae that we attached to

15  her honbak for luck, those were returned to us after her body

16  was discovered, and they were given to us in a red plastic bag

17  that had "biohazard" written across it.  So, I have to ask, in

18  what world is it okay for a son to have to clean his own

19  mother's decomposing flesh out of the links of her bracelet?

20  Because that's what my brother had to do.

21          The norigae discolored, disintegrated, saturated with

22  toxic fluids from my mother's decomposing body and possibly the

23  bodies of others that surrounded her, we don't know.  So, is

24  that all somehow acceptable simply because he didn't kill her,

25  and simply because the charge today is wire fraud?

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Up until that moment I think I was clinging to some

2   kind of protective denial, some version of this nightmare that I

3   could emotionally survive.  I heard the words "decomposing" and

4   "rotting" and "bug infested," and I read the affidavits and saw

5   the news reports, but nothing, nothing prepares you for the

6   moment when you're handed the evidence of that horror, and in a

7   red plastic biohazard bag.

8    Seeing all those abstract words suddenly become a

9   reality broke something in me, and I will never be whole again.

10  Grief is supposed to be normal.  It's a part of the life cycle.

11  It's natural and expected and something that we'll all

12  experience at some point.  But this, this isn't normal.  The

13  Hallfords took our grief and our mourning, and they twisted it

14  into something so horrific that I feel like I'm in a walking

15  nightmare, and I can't wake up from it.

16   Your Honor, I'm begging for the maximum sentence

17  possible.  Twenty years isn't enough.  They preyed on the

18  vulnerable not once, not by accident.  This wasn't a mistake.

19  Please help send a message to us, to the community, to others

20  who are even thinking about exploiting a family's grief, that

21  the dignity of the dead and the peace of the families that are

22  left behind are still worth protecting, and they will not go

23  without punishment.  Thank you.

24   THE COURT:  Thank you, Ms. Wilson.

25   MR. NEFF:  Just for planning purpose, Your Honor, I

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    want to let the Court know that I believe I have approximately

2    four more people.  I don't know what time the Court will want to

3    take its break.  I can continue.

4        THE COURT:  Why don't we get through all the victims,

5    and then we will take a quick break.

6        MR. NEFF:  Yes, Your Honor.  Ms. Lisa Ostly.  Is

7    Ms. Ostly here?

8        MS. OSTLY:  Hello.  My name is Elisabeth Ostly.  It's

9    spelled E-L-I-S-A-B-E-T-H, O-S-T-L-Y.  Your Honor, my name is

10   Elisabeth Ostly, and I stand before you as a bereaved daughter,

11   and as a member of the countless families whose loved ones were

12   dishonored by the abhorrent actions committed by Jon Hallford.

13   While his federal offenses may appear to be merely victimless,

14   white collar crimes, the actual gravity cannot be overstated,

15   for its impact is deep, and its wound on our souls can never

16   heal.

17       Jon committed wire fraud and spent his ill-gotten gains

18   on personal items like luxury cars, vacations, jewelry, and

19   cosmetic surgeries.  Jon gave nearly 200 families urns of

20   powdered concrete instead of their committed remains.  Jon

21   maintained the fraud for years by covering doors and windows of

22   the Penrose building, fabricating false death certificates, and

23   lying to federal -- to funeral providers, regulatory bodies, and

24   families.

25       Jon stole our money instead of using those payments to

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   cremate our loved ones, instead of choosing to let our loved

2   ones decay all together in that doomed building in Penrose.

3   These acts are not mere negligence.  They represent prolonged

4   intentional deceit over years, betraying vulnerable people at

5   their most fragile moments.

6        The desecration of my father's remains has shattered

7   the sanctity of his final farewell, leaving my family and me in

8   a perpetual state of disbelief and sorrow.  The knowledge that

9   my father, Bruce Ostly, who lived his life with dignity and

10  compassion, was denied his last wish to be returned to the Earth

11  with respect, has been an agonizing burden we will forever bear.

12       The pattern of egregious misconduct in both the

13  handling of deceased individuals and the exploitation of

14  pandemic relief funds represents a profound moral and legal

15  breach.  Jon Hallford should be sentenced to the maximum

16  allowable under federal law, not only to reflect the severity of

17  his crimes, but also to ensure justice is served for victims,

18  deter others from similar violations, and hold trust in

19  institutions designed to protect the living and honor the dead.

20  Thank you.

21       THE COURT:  Thank you, Ms. Ostly.

22       MR. NEFF:  Is Ms. Krista Johnsen here?

23       MS. JOHNSEN:  My name is Krista Johnsen.  K-R-I-S-T-A,

24  J-O-H-N-S-E-N.  I had another nightmare last night, a nightmare

25  of having everything stolen.  I am the daughter of Dale Marion

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Johnsen.  She lived to almost 90 years old.  She and my dad were

2    married just shy of 50 years.  And since my dad served in the

3    U.S. Army during the Korean War, and he predeceased my mom by

4    almost 20 years, he was buried at the National Veterans Cemetery

5    in Dayton, Ohio, with all due military honors.  When my mom died

6    in October of 2020, we used Return to Nature as a funeral home

7    to cremate her body and to send those cremains to the Dayton

8    National Cemetery.

9         Because of COVID, we decided to wait until the next

10   year to have her cremains shipped to Dayton to be buried

11   alongside my dad.  And we left them, her supposed cremains, with

12   Return to Nature during that time.  That's what the Hallfords

13   led us to believe.  It's not what happened.  Like others here,

14   the Hallfords left my mom's body to rot in an un-air-conditioned

15   room for several years.  They shipped something, not my mom's

16   cremains, from Colorado, and they even charged us extra for the

17   shipping to the National Cemetery in Dayton.

18        I flew there and buried who knows what alongside my

19   father on the sacred grounds of the military cemetery.  And that

20   cement or cat litter or whatever it was was buried with my dad

21   in a hallowed military cemetery for several years.

22        In October of '23, I got a call from the FBI that my

23   mom's body had been identified in the building with the other

24   Return to Nature Funeral Home scandal bodies.  I was filled with

25   shock and anger and sadness and horror that I had failed my mom

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    when I hired Return to Nature to care for her remains.  I had

2    not conceived of a world where swindlers would prey on people

3    with their recently departed loved ones, much less that this

4    would happen to me and my family.

5            My mom was my best friend.  When we moved out to

6    Colorado six years ago from Illinois, my husband and I bought a

7    house that had an unfinished basement, and we built a fully

8    handicapped accessible apartment for her so that she could age

9    in place and be close, and I could take care of her as her

10   health declined.

11           Taking care of her at the end of her life was an honor.

12   She was a brilliant woman who had a difficult life.  Among other

13   things, she had an accident in college, and part of her spine

14   was fused together, but that didn't stop her.  She was a teacher

15   her whole life, but she taught four- to five-year-olds how to

16   read and write in a couple of different schools for many years.

17   She loved to problem solve, to read, and to travel.  She loved

18   learning about health and nutrition.  She loved public

19   television and murder mysteries like Agatha Christie novels.

20   Her lifelong mantra was to leave a place better than how she

21   found it, and even in her 80s she was on an accessibility

22   committee of a board of the Brookfield Public Library in

23   Illinois.

24           She grew up in Chicago, Iowa, and Ohio.  She graduated

25   from Northwestern University with an education degree before

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   this was a common thing to do.  She studied abroad in France in

2   the 1950s, and became fluent in French.  She made sure all of

3   her kids lived abroad and were fluent in another language, and

4   we went to some of the finest universities in the nation.  I

5   feel such a sense of shame around what happened, even though

6   logically I know it is not my fault.  I was tricked, and I feel

7   angry about that.  My mom did so much for me throughout her

8   life, and I feel like I failed her in this final act of getting

9   her properly buried with my dad.

10          There's also another layer to this, which is that a

11  friend of mine, Elizabeth Gannon, already testified, and that

12  is -- I referred her after my parents -- my mom died, I referred

13  her to Return to Nature.  And I know she said in her testimony

14  that the decision was completely hers, and she doesn't in any

15  way try to make me feel guilty about having made this referral,

16  I still feel what I feel.

17          This crime made me pay thousands of dollars for her

18  supposed cremation.  I had to fly to Dayton and rebury my mom's

19  ashes at my dad's gravesite.  I also had to take days away from

20  my job going to -- I've been going to some therapy around this,

21  because some of the things the injuries -- because they are

22  mental, they're more long lasting.

23          Like others, I'm a changed person.  I'm much less

24  positive than I used to be.  I'm less trusting, and I view the

25  world through a distrustful lens.  I recently interviewed a

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    person to be a dog sitter, house sitter, and I just couldn't

2    hire someone, because of the trust issues.

3            As I'm the founder and sole proprietor of a nonprofit

4    organization, and I have faced challenges in development of that

5    organization stemming from this, what happened with the

6    Hallfords.  I have managed to maintain essential operations, but

7    I have not advanced the organization as I had originally

8    planned.

9            There is something so sacred about end-of-life rituals.

10   Every culture has them.  Even some animals, like elephants have

11   them.  My mom's dead body being so horrifically treated for

12   several years feels like such an awful end to such a wonderful

13   life, and peace of mind around this has been taken from me

14   forever.  She did not deserve this ultimate abuse of her corpse,

15   and I am left dealing with the aftermath.

16           My life has been indelibly altered, and not for the

17   good.  And I am working through the healing process.  I

18   respectfully request more than the maximum sentence for Jon

19   Hallford.  He does not deserve leniency, just as my mom's body,

20   my parents' gravesite, and the Dayton Military Cemetery did not

21   deserve to be desecrated.

22           THE COURT:  Thank you, Ms. Johnsen.

23           MR. NEFF:  If we could call Kailynn Page, please.

24           MS. PAGE:  Hello.  My name is Kailynn Page.

25   K-A-I-L-Y-N-N, P-A-G-E.  I'm not a good public speaker, so bear

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    with me.

2    THE COURT:  It's all right, Ms. Page.

3    MS. PAGE:  Your Honor, members of the court, and

4    everyone listening, my name is Kai.  My big brother, David, was

5    one of the individuals involved in this case, and his body was

6    left on the floor of Return to Nature for a whole four years.

7    My brother's decomposing body was stacked on top of others,

8    thrown into a pile, left like trash, a burden to be dealt with

9    later.

10    I remember David with a smile on his face.  He brought

11    joy to those who knew him, to me.  This tragedy has affected my

12    entire family, along with hundreds of others.  I stand here

13    today for our little brother, Cisco; our dads; grandma; and

14    every member of David's family.  All of us were profoundly

15    affected because we loved David deeply, and believe his body

16    deserved dignity even in death.

17    The shock of discovering that his body was mistreated

18    for so long and that the ashes we were given weren't even his

19    has been devastating beyond words.  The betrayal is something no

20    family should ever have to experience, and it is a wound that

21    can never fully heal.

22    Jon Hallford, I am disgusted by your actions.  I am

23    disgusted by who you have shown yourself to be.  You treated

24    human beings, people who were loved deeply, as if they were

25    trash to be hidden away and forgotten.  You made a choice day

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    after day to keep doing it.  You lived with the smell, the

2    sight, and the horror of what you caused, and you did nothing.

3    You could have stopped at any point, and you didn't.

4         You disgust me because you were comfortable in that

5    filth and in that cruelty.  You disgust me because you didn't

6    even have enough decency to pretend to care, even now that

7    you've been caught.  We don't even see your face.  I don't

8    believe you truly feel the weight of what you've done.  You only

9    feel the weight of finally facing consequences, and I'm not sure

10   if you even care based on past text messages and your actions as

11   a whole.  Everything you and your partner did shows you did it

12   all for your own selfish reasons.  You didn't have value for our

13   loved ones, and that I will never understand.  You have been a

14   stain on what it means to be human.

15        I want the Court and everyone here to understand that

16   this wasn't an accident.  This was deliberate.  You acted out of

17   selfishness and cowardice, not desperation.  You made the

18   conscious choice to betray hundreds of families and the

19   conscious choice to desecrate the people we loved and still

20   love.

21        You even considered getting rid of my brother and

22   others in a giant hole like some vile soup.  Who thinks that

23   they could go through with that?  You would have if you could

24   have, and it makes me sick.  Instead of never letting this

25   happen in the first place, you went on far -- for at least four

Kevin P. Carlin, RMR, CRR

58

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    years worrying about how to cover it up and save yourselves.

2    Make money and strive, no matter the cost.

3            You couldn't even have respect for yourselves.  Where

4    was your moral compass?  I do find peace knowing that in this

5    life or the next, you will face justice for what you've done.  I

6    can't say I know what you deserve.  I don't.  But no sentence

7    could ever undo what you did.  No apology can undo this, and

8    nothing will give David or any of the other victims the dignity

9    you stole from them.

10           But I hope you live every single day of your life

11    thinking of how utterly vile your actions were, and how you will

12    be remembered not for anything good, but for the horrific harm

13    you chose to cause.  We will never forget, and neither will you.

14    I wish I knew there was something in you that truly felt bad.  I

15    will never know, even if you say it, but you did that to

16    yourself.

17           To the families of the other victims, to those who

18    still don't know if their loved ones were involved in this case,

19    and to everyone affected, whether you had to see it, hear about

20    it, live through it, or are still waiting in the dark, I am so

21    deeply sorry for what you've gone through.  You didn't deserve

22    this, and none of us did.  I stand here today not only for my

23    brother David, but for all of you as well.

24           Thank you, Your Honor, and thank you to everyone here

25    today for giving me the chance to speak for my brother and for

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    all of us who have been forever changed by this tragedy, and

2    good-bye, Jon.

3         MR. NEFF:  Samantha Naranjo?  Is Ms. Naranjo here?

4         MS. NARANJO:  Good morning, Judge Wang.

5         THE COURT:  Good morning.

6         MS. NARANJO:  Thank you for allowing me to speak

7    today.  My name is Samantha, S-A-M-A-N-T-H-A.  My last name is

8    Naranjo, N-A-R-A-N-J-O.  My grandmother Dorothy Tardif was one

9    of the 189 bodies found inside Return to Nature building in

10   Penrose, Colorado.  I stand in front of you today due to the

11   actions done by Jon Hallford and his wife, Carie Hallford.

12        Today, you have the daunting task of sentencing Jon

13   Hallford for his crimes in regard to -- sorry -- in regards to

14   conspiracy to commit wire fraud.  As we all know, this crime is

15   because of another crime in state court, a horrendous and

16   inhumane nightmare that my family and I will always be haunted

17   by.

18        Because of the crimes this couple committed, we were

19   given Quikrete mixed with unknown remains.  We thought it was my

20   grandmother and mixed them with her husband and her son, who

21   passed prior to her.  I will forever be carrying around

22   someone's loved one that I can never identify.  I had to cremate

23   my grandmother.  I, as her grandchild, even though she has five

24   children, one year and two months after she passed away.  My

25   grandmother gained weight while rotting with 188 other bodies in

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    a building covered in bugs, seeping from all four corners.

2         I've shown up for countless court dates, both state and

3    federal.  I sat and watched the building of said crimes be

4    demolished by the Environmental Protection Agency.  I've

5    appeared via Webex and spoke to the state capitol in regards to

6    a bill to license and regulate the funeral home industry.  I met

7    the governor at his mansion as he signed the bill into law.  I

8    sat in person via Webex with department regulatory agencies to

9    help implement regulations and licensing for the funeral home

10   industry.  I sat with and spoke with -- via Webex with state and

11   federal prosecutors.  I've met government officials from federal

12   agents to deputy coroners, state representatives, to the city

13   mayor.  I've held a gathering honoring all 1,178 victims and

14   their families, bound together as we share each other's loved

15   ones, a newfound family that has connected us in a way that no

16   one should ever have to, as well as we can all relate and help

17   each other get through this horrific situation.

18         I have and will forever be scarred by Mr. Hallford and

19   his wife, Ms. Hallford.  These individuals took money for a

20   service that they not only failed to do, but in the process to

21   cover it up, the lack of service, they desecrated our loved

22   ones' bodies in such a disrespectful manner that not only

23   crosses a moral line, but also any religious outlook.  These

24   people did this without any sign of remorse.

25         So, while this Court is looking at these crimes in a

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  financial perspective, to us families, these crimes impact us in

2  ways no money could ever make up for.  There's no way to put a

3  dollar amount on a monetary value to our lifelong suffering.

4  Not only did this couple violate the rights of our loved ones,

5  but our beautiful state left us unprotected by people like Jon

6  and Carie Hallford.

7         I strongly believe by holding the highest statutory

8  maximum penalty to these criminals, you are helping us families

9  who are still fighting to protect our state from future monsters

10  like the Hallfords.  Thank you kindly for your time today, and

11  thank you generously for setting a standard for our beautiful

12  state, for not just me, my child after me, but also everyone who

13  lives in the State of Colorado.  We all deserve this respect.

14  Thank you.

15         THE COURT:  Thank you.

16         MR. NEFF:  Your Honor, we do have one more.  I'm

17  sorry.  I did have one more additional witness, and that would

18  conclude the victim portion.  If I could call that witness?

19         THE COURT:  Yes, please.

20         MR. NEFF:  Thank you, Your Honor.  Ms. Chandra Savage.

21         MS. SAVAGE:  My name is Chandra Savage.

22  C-H-A-N-D-R-A, S-A-V-A-G-E.  In May of 2020, during the height

23  of the pandemic, when everything was uncertain and nothing was

24  normal, we were at our loved one's bedside caring for him,

25  saying our final goodbyes, and comforting him until he took his

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   final breath.  We watched kind, caring, humbled me, and loved

2   deeply slip away.

3           Due to financial constraints, we were unable to honor

4   his final wishes.  And with a heavy heart, we had to make the

5   decision to have our loved one cremated against his wishes.

6   With a list provided by hospice, I was given the daunting task

7   of making the call.  Return to Nature had five-star reviews,

8   with only one negative review about parking, and a beautiful

9   website that was well thought out.

10          Carie Hallford was the first to answer my call.  It was

11  a professional conversation, and assuring me that our loved one

12  would be taken care of with respect and dignity, and that a tree

13  would be planted in his memory.  That never happened.  I

14  provided the information requested, and we anxiously awaited

15  his -- the arrival.

16          Jon Hallford arrived alone and ill-prepared.  Due to

17  the configuration of his home, he was unable to get the gurney

18  into the house, so instead of finding someone else to help him,

19  he tasked myself and two of his nephews with placing our

20  lifeless loved one on a sling and carrying his body out to a

21  gurney.

22          But the trauma didn't stop there.  He lowered the head

23  of the gurney first, and all of the fluids that our loved one

24  had been struggling to breathe through ended up on his face.

25  Jon simply wiped it off with a sheet and placed that same sheet

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    over our loved one in front of us with no remorse, and carried

2    on about his merry way.

3            I've been in healthcare for over 20 years, and I work

4    side by side with the local funeral homes who picked up our

5    beloved elderly from our facility.  I knew -- I felt something

6    in my heart, something was wrong.  But being in healthcare as a

7    nurse, an infection preventionist and scheduling, I had a firm

8    understanding of how the pandemic had affected business and

9    staffing, so I brushed the red flags off, under the rug.  What

10   else was I supposed to do?  Add to the family trauma, and demand

11   we carry his body back inside and wait for the next time -- the

12   next person to show up, hoping that it would be better?

13           We planned an outdoor service to lay our loved one's

14   remains to rest at the foot his brother's grave site, next to

15   his father.  I called Return to Nature to inquire when his

16   cremains would be ready for pickup, and that the cremains could

17   be placed in an urn and pendants we had purchased online.

18   Although I had not received a bill yet or even been informed of

19   payment methods, Mr. Hallford's wife informed me -- was quick to

20   inform me that until the services were paid in full, and that

21   they could not -- the cremains could not be picked up, and that

22   transferring the cremains to the urn would result in additional

23   fees.  My final conversation with Return to Nature had shifted

24   from professional and empathic during my initial contact, to

25   abrupt and cold.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    I received the balance due via email and paid it in

2    full online within minutes so that my brother-in-law could

3    collect our loved one's cremains, hoping to put this experience

4    behind us.  However, in October 2023, after my brother-in-law

5    delivered vacuum trucks to return to Return to Nature for his

6    employee as part of the cleanup effort, it became abundantly

7    apparent that our experience with Return to Nature was far from

8    over.  And instead of our experience being traumatic, it would

9    become an unfathomable nightmare.

10    I have had to overcome feelings of immense guilt,

11    anger, and sadness for contacting and paying Return to Nature

12    for services, or lack thereof.  My experience with Return to

13    Nature was my first experience ever dealing with the funeral

14    industry outside of my hometown, where the funeral home owner

15    and director had always remained kind, supportive,

16    compassionate, professional, and for many of us, they were our

17    neighbor, our friend, or our classmate.  He didn't act like Jon

18    Hallford, thank God.

19    Return to Nature has deeply affected my sense of trust

20    and security during already disheartening times.  Undoubtedly my

21    brother-in-law has struggled with the thought of delivering

22    vacuum trucks to possibly clean up his own uncle's decomposition

23    fluids.  My family has been forced to relive the loss of our

24    loved one, and his memory has been tainted with a horrific

25    debacle of Return to Nature.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    We do not know if we received his cremains, cement, or

2    someone else's loved one.  We don't know who we put to rest at

3    the foot of his brother, next to his father.  And now, we have

4    to find a way to accept the unthinkable.  We may never know.

5    The owners of Return to Nature are not nor were they ever real

6    honest and caring like their website said, like his Facebook

7    said, like his Instagram said.  I looked before I ever used him.

8    They are just a disgusting disgrace to the funeral industry that

9    has done nothing but lie and prey on families during difficult

10    times.

11    They have mentally -- they have created mistrust and

12    mental anguish for thousands of family members who have been

13    forced to relive the loss of their loved ones.  If they had one

14    ounce of humanity left, they would dig deep in their burning

15    souls to give family closure with the actual truth of what they

16    did with our loved ones' bodies.  I am angry they have created

17    so much unnecessary emotional trauma, and are not deserving of

18    the many tears that I have cried over their disgusting,

19    inhumane, criminal behavior.  I pray that you have to lie awake

20    in your prison cell tormented by the ghastly scene that you left

21    behind for many years.  Thank you.

22    THE COURT:  Thank you very much, Ms. Savage.  All

23    right.  Mr. Neff, is that -- are those all the victims?

24    MR. NEFF:  Yes.  I believe that is all the victims,

25    Your Honor.  So, that concludes the portion of the victim

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    presentation.

2            THE COURT:  All right.  So, we will take a quick

3    break, about five to ten minutes just so that people can get up

4    and stretch, go to the restroom, and then we will resume.  We

5    will be in a brief recess.

6            (Recess at 11:09 a.m., until 11:22 a.m.)

7            THE COURT:  Mr. Neff, at this time I will give you an

8    opportunity to speak on behalf of the Government as to which

9    sentence you believe is appropriate in this case.

10            MR. NEFF:  May it please this Honorable Court,

11    Counsel, Your Honor, in this case, the Government is -- under

12    the terms of the plea agreement, the most we could ask for is 15

13    years imprisonment, and that's what we're asking for, the max

14    that we negotiated under the terms of the plea.  It's clearly

15    warranted and justified.

16            To some extent, it's difficult to follow on the heels

17    of the 12 individuals who just spoke here in open court, who

18    showed a lot of courage, strength, sadness, emotion, because

19    their words really do speak a lot louder than mine.  They were

20    the affected ones.  They were the injured ones, and their voices

21    were the strongest.  It's hard not as a human to sit here and

22    listen to what we just saw in this courtroom, and listen to and

23    not be touched and moved.  That is our human condition, and it

24    was very powerful.

25            And it was powerful for a reason, because this crime

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   did not have to occur.  This crime was senseless.  This crime

2   was so deep on so many levels.  As noted by a number of these

3   individuals, the defendant has pled guilty to and is before the

4   Court on the offense of wire fraud.  It's a statute.  It's a

5   fraud case.  And let's be clear here, there was absolutely a

6   swindle here.  There was monetary damage.  The Hallfords

7   promised these families a burial and cremation of their loved

8   ones.  Jon Hallford looked these people in the eye, shook their

9   hands, promised them he'd take care of their loved ones, showed

10  up at their houses, collected the bodies.

11        His wife participated in this, and they gave them the

12  impression that all things would be taken care of with due

13  respect, and they collected payment for that.  That's part of

14  the fraud.  It is a fraud.  It does involve loss in that

15  respect.

16        But on October 5th of 2023, when the Fremont County

17  Sheriff's Office obtained a warrant and entered the Penrose

18  location, found the 191 decomposing bodies, it was clear that it

19  was indeed a big fraud.  The money that people had paid for the

20  funeral or the cremation was all for nought.  The cumulative

21  loss for these people was $193,000.  So, as I sit here, yes,

22  this is a wire fraud case.  It involved lies and deceit, and

23  people lost money in the tune of $193,000.  So, it fits the

24  definition and a classic textbook case of fraud.

25        But any reasonable, normal person who hears the facts

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    of this case and the relevant conduct that this Court can

2    consider in this case knows that this was no garden variety

3    fraud.  There was incalculable harm to the next of kin and

4    families that we've heard from who are here or in their papers

5    or can't attend.  There was untold emotional damage, trauma,

6    guilt, rage, all these experiences these people have said,

7    they're so real, and we've heard about it.

8         The pain, the grief, the torment continues to this day,

9    as we've heard.  We've heard people say it will haunt them until

10    the day they die.  The number of people we've heard have had to

11    go into counseling and therapy to cope with the offense and its

12    effects, some have even lost confidence and trust in humanity.

13    They're forever damaged by this crime.  How horrible is that to

14    think their trust in humanity has been taken because of this?  A

15    number of them suffer from night terrors, sleepless nights.

16    They have physical ailments due to what occurred here.  Some

17    take medications now that they never dreamed of taking to sooth

18    and deaden the emotional pain from this.

19         So, to say all this and note that yes, this is a fraud

20    case, yes, it involved economic damage, but as pointed out by

21    these people, and there can be no dispute about it in this

22    courtroom, this crime was a violation of all societal norms,

23    decency, all boundaries and societal norms that allows for

24    respect of the deceased were crossed and just blown right by

25    year after year, body after body by this man and his wife.

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1     The respect that we have in our society, in our culture

2  we have traditionally given to allow families to grieve for

3  their loved ones and to memorialize the death of their loved

4  ones in their own unique ways.  We heard about that based on

5  family traditions, based on culture, based on customs, based on

6  religious views.  That's unique and individual to people in our

7  society, and that's valued in our society.

8     However, that sacred rite, for no lack of a better

9  word, and that opportunity to bury one's loved ones in a

10  dignified and honorable fashion was stolen, make no doubt about

11  it, by this defendant, and that's why he's before this Court.

12  This crime indeed, as many people have said and acknowledged,

13  but it bears repeating, was the ultimate betrayal of trust.

14  When people were at their weakest, most vulnerable moment while

15  mourning their loved one, they were taken advantage of.  Yes,

16  this case does fall way outside the heartland of typical fraud

17  cases, and yes, this case does warrant a maximum penalty as I'm

18  allowed to argue for under the plea agreement, which is 15

19  years.

20     Now, I can't speak in the voice that we heard from this

21  podium, the people who here live and present, but there's just a

22  handful of statements that I think -- there's excerpts from that

23  I'd like to note to the Court, because as I've indicated, I'm

24  just an attorney making statements here.  The strongest impact

25  and the most important point the Court can hear is from these

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    victims and what happened.  So, I'd like to just quote from a

2    number of their statements.

3         There was one particular victim who was not able to be

4    here today because of the travel, and she had car problems, but

5    I do want to read her statement and emphasize the loss that she

6    had, because I believe it is unique, and it's something the

7    Court should hear.  This relates to Ms. Jataesha McCann.

8    Ms. Jataesha McCann was writing on behalf of her deceased child:

9         This crime pertaining to the Hallfords has affected me

10   and my loved ones in a horrific, heartbreaking way.  It is a

11   terrible thing that these individuals have done.  We all trusted

12   them with our loved ones, someone who has meant the world to us.

13   We were reassured that they will safely and properly take care

14   of our loved one.  I am emotionally damaged.  I went four years

15   thinking that my little infant's ashes were safe with me.  The

16   day I received the call that something terrible had happened, my

17   heart shattered into a million pieces again.  No, I was not

18   fully healed from losing my child.  I was still losing --

19   grieving the loss of my baby.  Then to hear that he was not

20   properly cremated broke me and my family again.

21        During this time, I pushed away a lot of my loved ones

22   because I was livid, so much rage inside of me.  I have night

23   terrors of this matter.  It is gut-wrenching.  It is hard for me

24   to sleep at night.  I have a four-year-old son that I must care

25   for, so I have no choice but to be strong for him.  I am seeking

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    counseling.  I put it off for so long, because I'm afraid to

2    talk about the situation, because it is disgusting.

3          I will have to suffer with what the Hallfords have done

4    for me the rest of my life of my time on this Earth.  Every day

5    I must go through the pain of knowing that this horribleness is

6    never going to change.  It will always be there to affect me.

7    All of the victims are awarded compensation for this.  Yes, we

8    should be compensated, but no amount of money can change what

9    these individuals have done.  No amount of money can fix the

10   pain that each one of us has experienced.  No amount of money

11   will ever justify why people are so cruel and nasty.  We all

12   deserve justice.

13         From the words of Ms. McCann, who lost her newborn and

14   trusted that her child would be cremated with dignity.  Those

15   are her words.  That's the pain he caused.

16         In addition, a couple other statements or excerpts, I

17   just note for the Court I felt were worthy of mentioning.  We

18   heard from Rodney Sefcovic, S-E-F-C-O-V-I-C.  His mother was

19   Ilke Lopez, and in part, I quote from his victim impact

20   statement:

21         The impact of this crime has not only taken away my

22   trust in people, but also destroyed my faith in humanity.  When

23   someone passes away, that is the final act of their life, and it

24   should be treated with the utmost respect.  To know that Ilke

25   was denied even that basic dignity is something I will never be

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    able to reconcile.  This betrayal has left me asking questions

2    no one should ever have to ask themselves.  What will happen to

3    my body when I die?  This will haunt me for the rest of my life.

4         And he concludes, the emotional trauma of this

5    discovery has been especially devastating for me, because I live

6    with traumatic brain injury.  The stress and anxiety have made

7    my condition significantly worse.  Immediately after I learned

8    the truth, I had to take an entire month off of work just to

9    cope.  Since then, I have missed weeks of work because I've been

10   unable to function.  This crime has taken a toll not only on my

11   mind and spirit, but on my livelihood.

12        From the words of yet another victim, why did this have

13   to occur?  This could have been stopped.  There was no need for

14   this to occur over the course of four years but for the

15   decisions of this man.

16        Finally, I would use the last statement from an

17   individual by the name of Charles Schweiss.  His excerpt reads

18   as follows:  The crime has forever changed me, my wife, and my

19   family.  I have lost trust in almost all humans.  Any mention of

20   this case in the news reopens the deep wound, sending me into

21   sleepless nights filled with restless thoughts of what mom --

22   mom endured.  I now take medication to sleep, while my wife

23   attends counseling to deal with the trauma.  The weight of

24   knowing what was in the urn that I kissed in the 2020 contained

25   nothing of my mother is unbearable.  The anger I feel is beyond

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    words.  The Hallfords deserve nothing less than the maximum

2    sentence.

3          This poor man kissed the urn of his mother-in-law at

4    the funeral, and now he felt embarrassed and shamed.  Why should

5    he have to carry that?  Why should he have to take that through

6    his life?  But he's just one of many people that have to take

7    these things.  The story about Mr. Johnson and the Pirates of

8    the Caribbean, unreal.  Unbelievable.  The man is just trying to

9    enjoy a family day out with his family, and this intrusion comes

10   into his mind because of what happened to his family.  This is

11   not just wire fraud.  This goes into a whole 'nother realm of

12   criminal conduct that needs to be addressed with the Court's

13   sentence.

14         So, let's talk about this.  I know some of the victims

15   have mentioned it.  It's part of the case, but it needs to be

16   addressed here, and it needs to be talked about in open court.

17   I know it's difficult, but a lot of the victims have alluded to

18   it.  The conditions at the Return to Nature Penrose facility

19   were graphic, were brutal, defies imagination.  I know the Court

20   has provided by the Government pictures from inside there as

21   part of the Government's sentencing statement.  We had those

22   sealed.  It was part of Agent Andrew Cohen's search warrant

23   affidavit, and it shows the pictures that occurred there.

24         So, I know the Court has seen that, but in this public

25   forum as we have this sentencing, it's important to make sure we

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  do understand what it was.  It was a house of horrors on

2  steroids, no doubt about it.  Even the most depraved Hollywood

3  director would dare to even present the conditions in a movie,

4  because it would be declared obscene as a matter of law, because

5  it was so grotesque and too offensive for public viewing.

6  Ghoulish and macabre do not even begin to describe what occurred

7  inside of his funeral home.

8       This has to be acknowledged.  This is part and parcel

9  of the conduct, the relevant conduct that this Court has to

10  consider.  As already alluded to by people in this case in the

11  presentence report, we had the bodies stacking in the

12  decomposition within the building.  Bodies were in fact stacked,

13  as someone said, like lumber, higher and higher.  Law

14  enforcement agents couldn't even fit into certain rooms, there

15  were so many bodies stacked so high when they first entered the

16  building.

17       Bodies were wrapped in tarps and duct tape.  Some

18  bodies were just left in body bags.  Other bodies were left

19  unclothed or partially clothed.  Some were just left on gurneys,

20  some on the floor, haphazardly strewn across the building.  The

21  facility had no air conditioning and coolant when law

22  enforcement entered.  All of the bodies were in various states

23  of decay and decomposition, just rotting away, completely

24  unattended to.  Some had flesh.  Some had bones.  Sometimes in

25  between.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Sometimes the bodies had moss and fungus growing on

2    them.  There was human decomposition.  As alluded to, someone's

3    brother, the last victim -- that's in fact true.  There was so

4    much decomposition, when the FBI first went in, they tried to

5    put boards down so they could walk through and find the right

6    bodies and take them out.  Because the pooling of decomposition

7    was so great on the floor, they finally got a pumper truck to

8    pump it out of the building.

9    Home Depot buckets were under tables where the bodies

10    were, and it was collecting human decomposition as it melted, as

11    someone said, as it dripped into the bucket.  As someone said,

12    the decomposition was seeping out all corners of the building.

13    That's true.  Up the walls.  It was horrendous.  The bugs -- I

14    don't need to go any further.  Yes.  There was bugs, flies,

15    larva, and all states within that building.

16    The smell was overwhelming, difficult to breathe.  It

17    was overpowering.  It was so bad, after the FBI agents went in

18    and had paper inside the building -- like paper to write notes

19    on, it smelled so bad afterwards, they had to transfer all that

20    to clean paper so it wouldn't be in their files.  That stench of

21    human decomposition was so bad, the camera equipment that they

22    took inside the building, it absorbed -- the rubber pieces on

23    that video and camera equipment absorbed the smell of

24    decomposition.  It was so bad they had to destroy and get rid of

25    their camera equipment.  That's how bad it was in this building.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    And as alluded to ultimately, the building was torn

2    down by the EPA, because it was essentially a toxic waste dump.

3    Think about that.  It didn't get to go to the regular waste

4    disposal location.  It had to go to a hazardous waste site

5    because of what he and his wife allowed to occur within there.

6    And then of course law enforcement had to respond.

7    People like Special Agent Chris Adams with CBI, who is at the

8    table, and Andrew Cohen with the FBI, they were just one of many

9    and a team of various law enforcement agencies who got involved

10    in this case.  Fremont County Sheriff's Office, Fremont County

11    Coroner's Office, El Paso County's Coroner's Office.

12    It was so bad at Penrose that they had to actually call

13    in a military special team from the Air Force who helps with

14    large-scale disasters to help recover and then identify the

15    bodies.  At Penrose, the recovery process, the agents worked in

16    40-minutes-at-a-time shifts.  That was all they could take being

17    in the building, and then they had to come out, because the

18    conditions were so horrific.

19    So, the FBI rotated three teams of approximately six to

20    seven people at a time for 40 minutes only.  Before they would

21    go in, they had to wear hazmat suits.  That's Tyvek body suits,

22    protective boots, gloves, respirators, full respirators.  The

23    conditions were horrific.  The bodies were heavy.  They were in

24    horrible shape.  It was extremely hot.  The environment was

25    overwhelming, extremely distressing, and disturbing.

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Afterwards, a number of the agents received counseling

2    and debriefings to deal with what they had seen in there.  After

3    the bodies were recovered and they'd come outside, there was a

4    whole contamination zone set up with a bunch of other agents who

5    would just clean off the agents who had been inside, and there

6    were medics there to give them IVs and to check their vitals to

7    make sure they were holding up under these conditions.  That was

8    just the first scene.

9    After that the bodies had to be -- they were recovered

10   at that point.  They were escorted by the highway state patrol

11   over to the morgue in El Paso County.  And at that location,

12   they had to rent and pay for several refrigerator trailers so

13   that the bodies could initially be stored before they were taken

14   inside to the coroner's office, where the daunting task of

15   collecting fingerprints, looking for medical bracelets, checking

16   dental records or ultimately DNA -- DNA sampling was used to

17   identify.

18   This whole process took from two to three weeks total

19   between the recovery through the identification process.  This

20   needs to be stated.  This was a horrendous scene.  It was all

21   caused by the defendant's conduct, along with his wife.

22   So, when we ask for the 15 years, what are some of the

23   factors that the Government wants the Court to think about and

24   consider?  Well, as noted by a lot of people, this went on -- it

25   wasn't a one-time, isolated incident.  It went on for four

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   years.  It involved lie on top of lie and deceit on top of

2   deceit.  It's hard to imagine where, when he's showing up after

3   two years, three years, and he's already collected 100 bodies in

4   this building, he's yet still willing to lie to people, look

5   them in the face and say, I will take care of your loved one.

6   It's a lie on top of a lie.

7            It makes it so horrendous to think that he acted in

8   this way.  And as alluded to by someone, there was surveillance

9   camera from -- cameras from inside the building.  The defendant

10  had that as part of his system there, and it's identified in

11  paragraph 52 of the presentence report, but it does describe an

12  incident where -- and I will just read from the report.

13           A review of surveillance cameras that were located on

14  the property revealed an incident on September 9th of 2023 in

15  which Jon Hallford entered the building with a body on a cart.

16  The interior camera shows multiple deceased bodies in the room

17  with one on a gurney.  Jon Hallford dumped, I emphasize dumped,

18  the body on the ground, on the floor, and wiped down the

19  decomposition from the gurney onto the other bodies in the room,

20  as that specific gurney was needed.  That's someone's father,

21  grandfather, child, son, mother, was just dumped on the floor.

22  This was the environment that he went to on a regular basis and

23  conducted business.  He knew what was going on in there.  He

24  knew it, but he continued.

25           And let's get some insight into his mind.  I want to

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    just cite two quotes that we provided the Court, but they're

2    worth noting.  Bodies started to collect without being buried or

3    cremated in September of 2019.  Only eight months into the

4    crime, he's texting his wife, and I will use his language and

5    what he said to his wife in a text to her on May 5th of 2020.

6    This was part of our sentencing statement:

7        I don't give a fuck about this family.  I will give a

8    fuck about what's happening in Penrose, our not going to prison,

9    and getting the fuck out of this community.  My one and only

10    focus is keeping us out of jail.  What is yours, question mark?

11        Eight months into this, that's his mindset.  I don't

12    care about anybody else.  I just don't want to go to prison, and

13    I want to get out of this community.  Then, forward to

14    October 6th of 2020, one year into the crime.  And that's when

15    he has a exchange -- or he writes this again to Carie, the

16    codefendant in this case, his wife:

17        By December 6th, we need to begin cleaning and

18    restoring the building in Penrose to be out by December 31st.

19    Options, A, build a new machine, ASAP.  B, dig a big hole and

20    use lye.  Where?  C, dig a small hole and build a large fire.

21    Where?  D, I go to prison, which is probably what's going to

22    happen.

23        Yes, indeed, that's happening.  And it should happen,

24    and it's going to happen shortly.

25        The defendant kept taking money and stacking bodies

80

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    even after he knew prison was inevitable for what he did.  In

2    the course of that, they even buried two wrong bodies -- this is

3    a man who doesn't care -- at a national cemetery, a veteran of

4    our community at Pikes Peak National Cemetery, he put the wrong

5    body in there.  Not only was it traumatizing for the veteran's

6    family when they found out, but the poor lady who wasn't

7    supposed to be in the grave, when she was contacted and her door

8    was knocked on, their whole family had to go through grief

9    because they found out their mother wasn't in fact cremated, and

10   the remains that they had were in fact not of their mother.

11        And as indicated, some people can say it better than

12   me, so I won't belabor it, he had a chance to fix all this.

13   He -- through his lies, he managed to get approximately $800,000

14   from the COVID -- from the Small Business Administration to keep

15   his business going during the pandemic.  That money was to be

16   used to keep the lights on and make sure he could give his

17   clients what they needed, his customers the service as they

18   buried their loved ones.

19        If he had taken just a portion of that, 100,000,

20   $200,000, whatever, he could have bought a retort, which is

21   effectively a cremation machine, and he could have perhaps

22   started to undo the wrongs that he had done, and clean it up.

23   He could have just stopped taking bodies when he realized he

24   didn't have anything to do with them.  He had numerous options

25   to put an end to this early on, even at a point where he knew he

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   was going to prison, but he just kept trucking right on down the

2   road.

3           Please send me your check, give me your credit card.  I

4   will take your money.  You bet I will take care of your loved

5   one.  All the while he's blowing the money from the Government

6   on the things we already heard about, lavish lifestyle trips,

7   entertainment, plastic surgery, SUV, college tuition, and the

8   list goes on.  It was greed, simple greed.

9           Well, I'm about done here.  I'm about to my closing,

10  but I would like to just end with a couple things.  Your Honor,

11  as counsel actually quoted from Ms. Stokes at the start, there

12  was a last-minute statement from a victim in this case that I

13  thought can kind of put a capstone or a conclusion on what has

14  occurred here, and what needs to occur here.  And it is from in

15  fact victim Margarita Stokes.  It was provided to the Court, and

16  again, I would like to just touch on a couple of her points that

17  she said, because I think they can bring this together.

18          She writes, the ashes we received, the ashes we

19  believed were my mothers, are now a haunting question mark.

20  You, Mr. Hallford, stole from us the certainty of her resting

21  place.  You stole the peace that comes with knowing my family's

22  loved ones was treated with dignity.  You deliberately turned a

23  moment of deep sorrow into a source of ongoing anguish and

24  doubt.  This was not only a professional failing on your part,

25  it was an intense personal violation that has left indelible

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   scars on my family.  We are left to wonder whose remains we

2   have, and this is a torment no family should ever endure.

3         Towards the end of her letter she states, when your

4   time on Earth concludes, Mr. Hallford, you will face an internal

5   reckoning for the heinous actions you committed.  The weight of

6   your deception, the disrespect you showed to the deceased, and

7   the pain you inflicted on grieving families will be a burden you

8   will carry into eternity.  There is no escaping the spiritual

9   consequences of such a profound betrayal of trust and human

10  decency.

11        And in her concluding portion she states, today,

12  however, marks a turning point for my family.  The uncertainty,

13  the anger, the feeling of violation, they have consumed our

14  thoughts and stolen our peace.  This sentencing closes a

15  chapter.  We will reclaim our lives.  We are taking back the

16  emotional energy and mental space that your horrific deeds have

17  occupied.  Today, we begin the process of truly moving forward,

18  leaving you and your deplorable actions in the past where they

19  belong.

20        The sentence you impose here today, Your Honor, will be

21  a pivotal and important part of the start of the healing process

22  for many of these victims here and who are not in this

23  courtroom.  It will allow them, as Ms. Stokes said, to start,

24  perhaps, to reclaim their lives.  It will allow them the chance

25  to restore their dignity, possibly restore their faith in

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    humanity by giving them some sense that there is justice, there

2    is some just punishment in our society.

3          And hopefully, hopefully, this sentence we're asking

4    for will allow them to once again find peace in their lives,

5    which they so richly deserve after all the pain and suffering

6    that they have gone through due to this man's actions.  For all

7    of these reasons, Your Honor, we are asking for the upward

8    departure, and we are asking you sentence Jon Hallford to 15

9    years' imprisonment.  Thank you.

10         THE COURT:  Thank you, Mr. Neff.  Mr. Hallford, at

11   this time, I want to give you an opportunity to address the

12   Court with anything you'd like me to know as I make my

13   sentencing decision.  You are under no obligation to speak, but

14   if you would like to say something, I would be glad to listen.

15         MS. SUELAU:  Would Your Honor like Mr. Hallford to go

16   to the podium or remain seated?

17         THE COURT:  He can remain seated.

18         THE DEFENDANT:  Your Honor and all those that are

19   present here today, and to all those who are not, James 1:8, a

20   double-minded man is unstable in all his ways.  That verse sums

21   me up during the four years of Penrose.  We opened Return to

22   Nature Funeral Home to make a difference, to facilitate change

23   within our industry, to do a better job by way of the

24   environment, and to do something good and right.

25         Then everything got completely out of control,

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   especially me.  No words of mine can ever justify my horrible

2   actions.  No words of mine can ever undo the deep and lasting

3   harm my actions have caused.  What was meant to be a soft place

4   for grieving families to land turned into a nightmare for all

5   those who trusted us.  However, the victims of Penrose are not

6   just limited to those families.  They also include the community

7   first responders, law enforcement, the El Paso Coroner's Office,

8   the Fremont County Coroner's Office, and all those involved with

9   the cleanup of Penrose, who all have to live with the horrible

10  memories of that place.

11         I have no idea how to express the amount of regret or

12  the amount of sorrow I feel towards everyone.  I am so deeply

13  sorry for my actions.  Please believe me when I say this is not

14  me.  Penrose is not who I am.  I made so many mistakes.  I am

15  sorry to my children, who are also victims of my decisions.  I

16  love my children, and I ask them to please forgive me for my

17  sins.  My actions have harmed my whole family, costing my

18  children their father and my parents their son.

19         To my family, I love you all.  Please forgive me.  I do

20  not recognize who I was during those four years.  I was living a

21  double life.  I was unstable towards my wife and my children, my

22  parents, my sister, pulling away from my friends and our

23  business, unstable in every way.  Living with the guilt of my

24  actions destroyed my soul, and it changed who I am.  I have

25  never been so lost.  I hated myself.  I still hate myself for

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    what I've done.

2            All the victims deserve peace and an absolution.  All I

3    can offer is my deepest apology and assurance that nothing like

4    this will ever happen again.  I will carry the regret of my

5    actions with me for the rest of my life, every single day.

6            I will not disrespect or dishonor any victim by blaming

7    my actions on someone else.  I am responsible for what -- for my

8    choices, and for my role in what took place.  I wish that I

9    could undo the harm that I have caused.  I know I can't, but I

10   do accept responsibility for causing that harm.  Thank you.

11           THE COURT:  Thank you, Mr. Hallford.  Although I may

12   not mention all of them, I have carefully considered the factors

13   set forth in 18 USC Section 3553(a).  My responsibility here is

14   to determine a sentence that is sufficient but not greater than

15   necessary to comply with the purposes set forth in section

16   3553(a)(2).  In considering the sentencing guidelines, I do not

17   start from the presumption that the guidelines are reasonable.

18   Instead, I must make an individualized assessment based on the

19   facts presented.

20           The factors that I consider according to the statute

21   are the nature and circumstances of the offense; the history and

22   characteristics of the defendant; the need to reflect the

23   seriousness of the offense, to promote respect for the law, and

24   to provide just punishment for the offense; the need to afford

25   adequate deterrence to criminal conduct; the need to protect the

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    public from further crimes of this defendant; the need to

2    provide the defendant with needed educational or vocational

3    training, medical care, or other correctional treatment in the

4    most effective manner; the kinds of sentences available; the

5    kinds of sentence and sentencing range established for someone

6    who commits this category of offense and has this criminal

7    history level set forth in the sentencing guidelines; any

8    pertinent policy statements in the sentencing guidelines issued

9    by the sentencing commission pursuant to 28 USC Section

10    994(a)(2) and in effect at the date this defendant is sentenced;

11    the need to avoid unwarranted sentencing disparities among

12    defendants with similar records who have been found guilty of

13    similar conduct; and the need to provide restitution to any

14    victims of the offense.

15        The Court begins this discussion with the nature and

16    circumstances of the offense.  As an initial matter, the Court

17    turns its clear eye to the elements of the crime to which

18    Mr. Hallford is pleading guilty in this court, conspiracy to

19    commit wire fraud.  The elements of that criminal offense are,

20    first, that the defendant agreed with at least one other person

21    to violate the law, to knowingly commit wire fraud.  Second, the

22    defendant knew the essential objective of the conspiracy.

23    Third, the defendant knowingly and voluntarily involved himself

24    with the conspiracy.  Fourth, there was an interdependence among

25    members of the conspiracy, that is the members in some way or

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    manner intended to act together for their shared mutual benefit

2    within the scope of the conspiracy charged.  And fifth, that the

3    defendant acted with the specific intent to defraud.

4         The elements of wire fraud are, first, that the

5    defendant devised or intended to devise a scheme to defraud as

6    alleged in the indictment.  Second, the defendant acted with the

7    specific intent to defraud.  Third, the defendant used or caused

8    another person to use interstate or foreign wire communications

9    for the purposes of carrying out the scheme.  Fourth -- and

10   fourth, the scheme was deployed by false or fraudulent

11   pretenses, representations, or promises that were material.

12        A scheme to defraud is conduct intended to -- intended

13   to or reasonably calculated to deceive persons of ordinary

14   prudence or comprehension.  A scheme to defraud also includes a

15   scheme to deprive another of money, property, or the intangible

16   right of honest services.

17        An intent to defraud means an intent to deceive or

18   cheat someone.  A representation is false if it's known to be

19   untrue or is made with reckless indifference as to its truth or

20   falsity, and a representation would also be false when it

21   constitutes a half truth or effectively omits or conceals a

22   material fact, provided it is made with an intent to defraud.

23   And a false statement is material if it has the natural tendency

24   to influence or is capable of influencing the decision of a

25   person or entity to which it is addressed.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1          The Court begins with these legal elements,

2     Mr. Hallford, not to provide a law school lesson to you, the

3     attorneys, or those in the gallery.  The Court begins here

4     because it frames its entire analysis of the Section 3553(a)

5     factors and the sentence that the Court has determined to be

6     sufficient but not greater than necessary to comply with those

7     factors.

8          In doing so, the Court recognizes that there is a state

9     case involving the abuse of corpse felonies to which you have

10    pled guilty.  But to the extent that there is any confusion, the

11    Court wants to make clear that it is those elements, the

12    elements of deceit and falsehood, that guides its consideration

13    in the sentence here today.

14         Mr. Hallford, you and your wife and codefendant, Carie

15    L. Hallford, were joint owners in Hallford Homes, LLC, which

16    operated under the trade name of Return to Nature.  You operated

17    Return to Nature Funeral Home from approximately August of 2017

18    through October of 20 -- October 5th, 2023, at which point it

19    was closed by the State of Colorado law enforcement and

20    regulatory officials.

21         You ran your funeral business from two locations,

22    including one in Colorado Springs and one located at 31 Werner

23    Road, Penrose, Colorado.  In 2017, as reflected in your own

24    sentencing statement, you gave an interview to a newspaper about

25    the start of Return to Nature, and I read your quote therein.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    When I -- Return to Nature encouraged its customers not to

2    embalm or preserve bodies with chemicals, he said.  When I

3    started learning about green burial, I started thinking, why on

4    Earth have we been doing this all this time, and how many times

5    have I facilitated a final moment with a family member, and

6    they've smelled or experienced formaldehyde, Jon said.  That's

7    where it really sunk in that I'm not going to do this anymore.

8    This is our passion.  I'm not going -- I'm not going to just

9    leave the industry.  I'm going to find a better way to do it.

10          Later on, the article notes that you say, in the

11    funeral business, there are no guidelines, so when a body is

12    being embalmed, whatever excess formaldehyde mixture is left in

13    the tank just goes right down the drain.  It's not neutralized.

14    It goes straight back into our water system that's eventually

15    recycled or used.

16          Beginning on or about September 15th, 2019, despite

17    those words, despite knowing that the funeral business -- or

18    perhaps because you knew that the funeral business lacked

19    guidelines, and continuing through October 5th, 2023, you

20    offered various services and products to the members of the

21    public, including funeral burials and cremations.  You

22    advertised your business to potential customers using the

23    internet website which stated, among other things, in the

24    frequently asked questions section, Return to Nature Funeral

25    Home is a unique family owned and operated Colorado Springs and

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1    Penrose mortuary service.  We operate with three generations of

2    funeral service experience and education.  Our family is here to

3    serve your family and to guide you through every step of the

4    bereavement process.  We cater to your family and provide your

5    loved one with the utmost professional care and discretion.  Our

6    family serving your family for over 80 years.

7         You and your wife typically met customers and offered

8    either burial or cremation using services of the Return to

9    Nature Funeral Home.  The customers included individuals making

10   their own funeral arrangements prior to death, family members,

11   or friends of the recently deceased or next of kin of the

12   deceased.

13        Then you would enter a contract for goods and services

14   with customers related to the services to be provided in

15   connection with burial or cremation.  When a customer selected

16   cremation, you would agree as part of the contract to arrange

17   for the body of the deceased to be cremated.  Afterwards, you

18   agreed to return the cremains, also referred to as ashes, to the

19   family member, friend, or designated next of kin.

20        When a customer selected funeral burial, you agreed to

21   provide a burial of the deceased at a designated cemetery as

22   well as supply a specific kind of coffin purchased by the

23   customer.  And in addition to these written contracts, you

24   verbally promised and represented to customers they would --

25   that you would provide either cremation or burial as set forth

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    within the terms of the contract.

2         A fee for these services for the end of life services

3    were not only contracted, but the cost of each contract varied

4    based on the goods and services that the customer believed he or

5    she was purchasing.  They commonly ranged between 900 and $1,500

6    for cremations.  Costs of burials were substantially higher than

7    the cremations in most cases, and you were paid by your

8    customers through various means, including cash, check, and

9    credit card.  Many of the customers paid Return to Nature with

10   credit cards, using a payment processing service Square, Inc.,

11   later known as Block, Inc., which operated within interstate

12   commerce and was located outside of Colorado.

13        But despite the promises in both written contracts and

14   through verbal interactions, the Hallfords failed to provide

15   even basic core services that are promised to its customers,

16   either a cremation or burial of their particular loved one.

17   Nonetheless, you continued to collect payment from such

18   customers for the funeral services and goods despite not

19   fulfilling their commitment to provide such service.  And at

20   times, the Hallfords also collected payment for cremation or

21   burial costs from an insurance company, a government entity, or

22   third parties connected to the deceased.

23        Beginning as early as September of 2019 and continuing

24   through 2023, you failed to cremate or bury approximately 190

25   bodies in connection with this scheme, and as a result,

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    collected in excess of $130,000 from victims for cremation or

2    burial services which you never provided.

3          The Hallfords attempted to conceal the fraudulent

4    activity by allowing 190 bodies, approximately, to remain in

5    various states of decay and decompensation within the Penrose

6    location in Penrose, Colorado.  And you concealed that gruesome

7    collection of bodies by preventing outsiders from entering the

8    building, covering the windows and doors of the building to

9    limit viewing from outside, providing false statements to others

10   regarding the foul odor emanating from the building and the true

11   nature of the activity occurring inside.

12         You routinely prepared death certificates for the

13   deceased, then filed or caused to be filed such certificates

14   with the Colorado state's electronic death registry.  On many of

15   the death certificates of the 190 bodies found in the Penrose

16   location, Ms. Hallford with your assistance falsely stated that

17   the method of disposition was either by cremation or burial when

18   truth of fact you knew that no disposition of certain bodies had

19   been done at all, because they were left decomposing at the

20   Penrose location.

21         At times you misrepresented to and concealed from

22   third-party business conducting cremation on behalf of Return to

23   Nature Funeral Home the true identities of some of the bodies

24   being submitted for cremation, and as a result, third-party

25   businesses at times misidentified within their own records the

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   identities of the bodies that they were cremating.  In a number

2   of instances, you provided the decedent's family members,

3   friends, or designated next of kin with cremains filled with

4   dried concrete mix instead of the actual ashes of the deceased.

5   On at least two occasions you arranged for and provided the

6   wrong body to a cemetery burial resulting in incorrect remains

7   being buried in a gravesite plot, while concealing this fact

8   from the next of kin.

9         A review of surveillance cameras that were located on

10  the property revealed an incident on September 9th, 2023, where

11  you entered some sort of contract with the family of the

12  deceased to provide end of life services, but instead, on

13  September 9th, 2023, you entered the building with a body on the

14  cart.  The interior camera shows that multiple deceased bodies

15  in the room with one on a gurney -- you dumped, Mr. Hallford,

16  the body from the gurney onto the floor, wiped down the

17  decomposition from the gurney from the other bodies in the room,

18  as that specific gurney was needed.  That's in the PSR at

19  paragraph 51.

20        Victim Jack Denis Edward Jackson's gravesite was

21  exhumed from the Evergreen cemetery.  He had died on July 12th,

22  2018.  That's before the alleged beginning of the conspiracy on

23  September of 2023.  Investigators located instant messages

24  between the Hallfords regarding the burial of Jackson in which

25  you wrote, I'm also 99 percent sure there is a dead baby in the

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    casket with him, and it was not opened at the cemetery.  The

2    body recovered was not that of Jack Denis Edward Jackson, and

3    there is no infant recovered.  That's in the PSR at paragraph

4    55.

5         On October 5th, 2023, the FBI state law enforcement

6    officers and the regulatory officials searched and processed the

7    Penrose location.  Within the Return of Nature [sic] building,

8    officials recovered multiple human remains in various states of

9    decay.  The conditions within the Penrose location presented an

10   extremely hazardous environment for all first responders and

11   other members of the public who may have encountered the

12   building.  Workers entering the building were required to wear

13   specialized hazmat gear, and they were only allowed to remain

14   within the facility for brief intervals due to the toxic

15   environment.

16        Law enforcement officers and any member of the public

17   who encountered the location were at risk for contracting

18   illness and thus suffering serious bodily injury.  After exiting

19   the building, workers were required to follow a rigorous

20   decontamination protocol to ensure the safety of their health.

21        Later, the Environmental Protection Agency condemned

22   the entire building at the Penrose location after determining it

23   to be a toxic waste site unfit for further human usage and a

24   serious health threat to others who might encounter it in the

25   future.  Ultimately, on April 20th, 2024, the EPA razed the

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   building to the ground.  The EPA then disinfected the building

2   materials and foundation and later transferred the debris to an

3   offsite hazardous waste dump.

4           On October 26th, 2023, after the discovery, victim

5   Melvin M. Utton, Junior's, gravesite was exhumed from the Pikes

6   Peak National Cemetery after his remains were recovered from the

7   Penrose location.  Inside the casket was the body of a heavily

8   decomposed female wrapped in duct tape and plastic sheets.  A

9   review of the records identified the female's date of death as

10  March 20th, 2020, and her cremation took place at Roselawn's

11  crematorium.  However, Roselawn had no record of her cremation.

12  That's in the PSR at paragraph 54.

13          During the same time period, Mr. Hallford, you engaged

14  in a separate scheme to defraud the Small Business

15  Administration that provided emergency assistance to small

16  business owners suffering adverse economic effects caused by the

17  COVID-19 pandemic.  All told, you received over $880,000 from

18  the SBA by at least falsely stating that you were not engaged in

19  any illegal activity, when in truth in fact, you and

20  Ms. Hallford were jointly engaged in a separate ongoing wire

21  fraud and scheme to defraud the customers of their business,

22  Return to Nature.

23          To receive those funds, you also falsely certified on

24  security agreements for each of these loans that all the loan

25  funds would be primarily used for personal, family, or household

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    purposes.  But once you received the 883 -- I'm sorry --

2    $882,300 from the SBA, and those occurred in April of 2020, May

3    of 2021, and November of 2021, you used it for your own personal

4    use and personal benefit by spending the funds on things such as

5    a vehicle, multiple vacations, entertainment, dining, tuition

6    for a minor child, cryptocurrency, cosmetic medical procedures,

7    jewelry, various goods, and merchandise from Amazon, and the

8    payments to other vendors unrelated to the business.

9            And what does this all mean in plain English?  Because

10   I have been reading from the legal documents filed in this case.

11   It means, Mr. Hallford, for at least four years, and five if I

12   extend it to the time period of the incorrect burial, you and

13   your wife met with people, told them you were very sorry for

14   their loss, assured them you would take care of their loved ones

15   and provide them a respectful and dignified end of life

16   experience, either through natural burial or cremation that was

17   better for the worth [sic], and you did nothing of the sort.

18           You not only defrauded them of their money,

19   Mr. Hallford, but you did so knowingly, that you did not provide

20   them with services that they were securing for their loved ones

21   who had passed away, but also for their surviving family member

22   and friends.  You defrauded them into believing them -- that you

23   were helping them fulfill the promises that they had made to

24   their loved ones at their ends of life.  You lied to them about

25   what you did with their loved ones' bodies, and then you

Kevin P. Carlin, RMR, CRR

97

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   returned to them concrete mix that was not anyone's ashes, and

2   in some cases you buried individuals in graves that were not the

3   graves of their own.

4        You lied to the Government that instead of loans to

5   help small businesses ride out the devastation of the COVID-19

6   pandemic, you took the money, and you did not fix Penrose, but

7   you spent it on personal things.  And then you lied again when

8   you were discovered in October of 2023.  You told the Colorado

9   Department of Regulatory Agencies that you were using the

10  building in Penrose to learn how to do taxidermy, and that you

11  knew that you had a problem there.  That's docket entry 77, at

12  paragraph 48.

13       I turn to the history and characteristics of the

14  defendant now to talk briefly -- well, actually, none of this is

15  brief, and so I apologize for that.  Mr. Hallford, the Court

16  notes that you have no criminal history, and unlike so many of

17  the individuals that come before the Court in this context,

18  either wire fraud or other felony offenses in the federal

19  system, you were raised in a small town in Oklahoma with two

20  parents and a stable upbringing.  You experienced no abuse.  You

21  had a comfortable lifestyle, and you had stable employment from

22  it appears 2004 until 2023.

23       Your history, as noted by your counsel in your

24  sentencing statement, indicates that you wanted to be a minister

25  at some point in your life, but you became disillusioned because

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  the person that you admired most in the ministry was found to be

2  engaging in extramarital affairs and deceiving the parishioners.

3  And so it is sad and difficult, Mr. Hallford, that you have

4  chosen a similar path of deceiving people who relied upon you

5  and who relied upon you in potentially one of the most

6  vulnerable time periods in their life.

7        Your character, Mr. Hallford, during this time is

8  reflected by some of the contemporaneously -- communications

9  that you and your wife, and who is also your codefendant, were

10  having during this time period.  Some of those text messages are

11  reflected in paragraph 65 of the PSR, but the Court took the

12  time to read and review all 4,000 pages of text messages that

13  were provided in discovery, and pulled out some of the most

14  egregious ones that we will cover later today.

15        I'm sorry I'm panicked.  If anyone smells Penrose and

16  enters the building or smells decomp, word will spread like

17  fire.  I'm completely freaking out.  That's in May of 2019.  And

18  yet, the scheme continued.

19        The fat one by herself will decompose the fastest,

20  because I didn't open the door to contain the 72 degrees that's

21  in there, as opposed to the 85, almost 90 that's in the building

22  where she is sitting.  That's sent in July of 2019.

23        So, that's difficult for the Court to understand that

24  the air conditioning actually went out in July of 2023, as you

25  posit, when in July of 2019, you were already trying to

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   decompose bodies by leaving the door open to the heat.

2          I don't give be a fuck about this family.  All I give a

3   fuck about what's happening in Penrose are not going to prison

4   and getting the fuck out of this community.  My only -- my one

5   and only focus is keeping us out of jail.  What's yours?  That's

6   in May of 2020.

7          In May of 2020, Mr. Hallford, you received hundreds of

8   thousands of dollars from the COVID relief funds through

9   IEDL [sic].  You talked in the text messages with your wife at

10  that time to try to fix Penrose, and yet you didn't do anything.

11  You didn't use that money to fix Penrose.  You didn't stop the

12  scheme at that time, and I note that some of the victims here

13  speaking today, their loved ones were given to you after May of

14  2020 to help them with their end-of-life decisions.

15         It wouldn't hurt to get a couple folding tables for

16  Penrose so we don't have to put anyone else on the floor.  That

17  was sent in April of 2023.  And if your plan for me is to Jill

18  myself and then pin Penrose on me, they will still get your

19  phone data.  If we get divorced, Penrose will come out, and they

20  will check our phones.  And once it does, there won't be any

21  hiding your involvement.  We either have to fix all of this, or

22  we have to begin living a horrible existence together until this

23  is all over.  That's July of 2023.

24         If Penrose were to get exposed, we lose -- we both lose

25  everything anyway.  We can't allow that to happen.  We can't

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1  allow our family to be destroyed.  I don't know what's happening

2  with the kids, but I know I'm willing to do whatever it takes to

3  fix it.  That's sent August of 2023, just a few months before

4  you were discovered.

5       You objected to these text messages reflected in

6  paragraph 65 as not reflecting moments of regret and reflection

7  as noted in other omitted text messages.  And so to address this

8  concern, the Court took it upon itself to read over 4,000 pages

9  of text messages to get a clearer picture of your

10 characteristics.  What the Court found, however, is when you

11 express regret and reflection, it is not about the families that

12 you were deceiving or committing wire fraud against the Small

13 Business Administration, taking money and spending it on other

14 things, not on business expenses.

15      Instead, what I see is an individual who is taking

16 money from individual families and from the government and using

17 it as you see fit in order to try to float your family, and no

18 money, no incidents, nothing, that suggests that you are at all

19 remorseful about what is happening to the families or those

20 bodies.

21      And one thing I was particularly struck by when I

22 looked through these text messages, Mr. Hallford, is the utter

23 lack of identification of the individuals.  I could only find a

24 handful of text messages that you exchanged with your

25 codefendant where you even refer to the individual by their

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    name.  Otherwise, you're talking about bodies, objects, things

2    that you were picking up from one location and transmitting to

3    another location.

4         You were talking about who is going to cover what, but

5    you're never talking about remorse that you have been

6    perpetuating this wire fraud against these families who have

7    trusted you with their end-of-life determinations.  And we will

8    go over some of these shortly.

9         You're sending lists of things to do on your off time.

10   You're talking about cleaning up Penrose.  You're talking about

11   as early as November 2nd, 2024, I don't trust that you wouldn't

12   turn witness on me.  This is to your wife and codefendant.  You

13   seriously want to talk about divorce in Tulsa that day?  It

14   stuck with me and has never been far from my mind.  I don't know

15   what to do about Penrose, and I will be the one going down for

16   it.

17        Your concern is that you are going to have to take

18   accountability and responsibility one day for it.  Your concern

19   is not in these messages that I've read that the people that

20   have trusted you not with their money -- of course they have

21   trusted you with their money -- but trusted you with the

22   end-of-life determinations, the promises and wishes.  The ones

23   that you are deceiving out of that security, none of these

24   messages refer to that.

25        In May of 2019, you texted, I'm sorry I'm panicked.

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1    I'm freaking out.  In May of 2020, we just now have a grip on

2    Penrose, and we're days away from getting this rolling.  I do

3    not have fucking time for this.  The same day you wrote, I

4    literally just told you, it was not my problem.  I'm not doing

5    anything with it.  I have other things to do, so either figure

6    it out or cancel it.  The fact that you would even ask this

7    morning shows that you have no concern for what little time I

8    have getting this fucking done or the amount of time I've

9    already put into it.  What I'm doing right now is saving us from

10   going to fucking prison.  Right this very second, we have a very

11   small window of grip on Penrose.

12        And yet that very small window closed, Mr. Hallford,

13   without you doing a single thing to rectify the situation.  In

14   fact, despite your lawyer's arguments in your sentencing

15   statement that you were really trying to serve everyone else you

16   could, and your own statements that it just got overwhelmed and

17   out of control, on May 12th, 2020, even knowing that you had

18   bodies stacking up already in Penrose, you asked your wife,

19   where are you?  Will you check Penrose, please?  And why aren't

20   we getting any new calls?

21        And she responds, we have a couple pendings on the

22   hook.

23        You were actively soliciting other people for your

24   business knowing full well you were going to take their money,

25   and you were not going to give them the services that they

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   asked.

2          On May 15th, 2019, you indicate, I would just prefer to

3   involve the boys, which I assume refers to your sons, as little

4   as possible until Penrose is not disgusting inside or out.  On

5   June 4th, 2020, after the first two -- June 4th, 2020, after the

6   first of the SBA loans were funded, you indicated you were

7   frustrated.  I'm sorry.  I assure you it's not for any other

8   reason than trial or error.  It's R&D.  It's learning as you go.

9   I'm trying.  I'm beyond freaking.  We're getting everything we

10  want right now, and that fucking Penrose could screw everything.

11  No one wants those bodies gone more than I do.  I'm sorry.

12         Well, Mr. Hallford, I'm here to assure you that there

13  are people who wanted those bodies taken care of in a way more

14  than you did, and you failed them in that hour.  You deceived

15  them, and you took their money, and you made them promises with

16  full knowledge that you were never going to fulfill those

17  promises.

18         In September of 2020 -- and this is just an example of

19  the fact that these individuals were not individuals to you.

20  They were not people, and they were not names.  You said to

21  Ms. Hallford, I'm thinking that if I can put a body in and then

22  we make that removal at Penrose in the morning at 5:00 a.m. or

23  so, then we would have time to come down here and put that body

24  away, take the body out of the tank, clean up, and be out of

25  here and headed back towards the Springs by when it's time for

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    him to take over being on call.  What do you think?

2            That is just an example of the lack of individual

3    identification that you showed these individuals and the

4    families who again you deceived, made representations to, took

5    their money through wire, and defrauded them.

6            The Government highlighted your statement, but the

7    Court will also pass on it from October of 2020, by

8    December 6th, we need to begin cleaning and restoring the

9    building in Penrose, and be out by December 31st.  Options,

10   build a new machine, ASAP.  B, dig a big hole and use lye.

11   Where?  C, dig a small hole and build a large fire.  Where?  D,

12   I go to prison, which is probably what is going to happen.

13           Finally, the Court highlights, because it does really

14   highlight the two types of wire fraud that is before the Court

15   today, on April 7th, 2021, after you had been given the first of

16   three EIDL loans from the Small Business Administration, and

17   before you got the second, you texted your wife, do you

18   understand if we get the $350,000, it will completely get us out

19   of debt and handle Penrose?

20           And she responded, I know, exclamation mark,

21   exclamation mark, exclamation mark.  Penrose, exclamation mark.

22   And you got that $350,000, and you did nothing with it to

23   rectify the Penrose situation.  And you continued the deceit and

24   the lies for two additional years.

25           Mr. Hallford, you and your counsel have both spent time

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    conceding the seriousness of the offense, and your attorney

2    argues that 120 months is just punishment for the offense.  She

3    also argues that the Court should not focus on the emotional

4    distress caused by the treatment of the bodies or their various

5    loved ones because you've pled guilty and will be separately

6    sentenced in state court for the non-fraud harm that this -- his

7    actions in a separate concurrent prosecution for abuse of

8    corpses.

9         For the reasons I have discussed earlier, this Court

10   finds that the fraud that you perpetuated is inextricably

11   intertwined with the resulting harm that has befallen the

12   victims in this case.  The seriousness of this offense for wire

13   fraud cannot be appropriately quantified simply through the

14   statements of the individuals who are here today, because some

15   people could not be here.  In each of these cases, you made

16   promises to those individuals that you would take care of the

17   end-of-life needs for their loved ones or promised the third

18   party that you would do so.

19        With respect to the SBA loans, you took that money from

20   the Government and promised the Government that you would use it

21   to -- for business purposes, and not for personal purposes, and

22   yet you didn't do that.  You didn't do that, and you even --

23   when you recognized that if you got that additional money, you

24   could get yourself out of debt and that you could take care

25   Penrose, you could take care of both of your objectives,

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    essentially, that you've talked about here today, to take care

2    of your family and to take care of Penrose, and then that money

3    taken over and over and over again from the SBA -- because there

4    was a third payment in November of 2021 -- was actually not used

5    to rectify the situation or to stop the scheme or to do anything

6    to resolve the issues at Penrose.  Instead, as the Government

7    indicated, you just persisted on.

8         The sheer impact is reflected by the names that are

9    reflected in docket entry number 114-1, listing all of the

10   individuals who have claimed restitution and listing the names

11   of their loved ones who have been deceased today.  I will not

12   take the time, although I think it would be appropriate to

13   reflect the sheer seriousness of this offense, to read each

14   individual name, because it will take enough time.  But I do

15   note for the record that these names of the loved ones who have

16   passed away are reflected at docket entry 114-1, which is the

17   first -- I'm sorry -- the third addendum that was filed on

18   June 25th, 2025.  And the sheer number of names and the fact

19   that the Court cannot read them all because of timing reflects

20   the seriousness of this offense.

21        The Court has also determined in terms of this sentence

22   that I'm about to pronounce and considered the need to avoid

23   unwarranted sentencing disparities among defendants with similar

24   records who have been found guilty of similar conduct and the

25   need to provide restitution to any victims of the offense.

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    I will begin briefly by the restitution, which

2    obviously is going to be a required component of this judgment

3    that I enter.  But as the victims who do not just include the

4    individual family members who made those end-of-life decisions

5    or the family and friends who were impacted by those end-of-life

6    decisions, but also the first responders, the law enforcement

7    officers, the individuals who had to clean up, raze, and know of

8    this, you've impacted not only these individuals, but the

9    community as a whole and the funeral home industry as a whole.

10    Your fraud has resulted in many of these victims

11    stating in their impact statements that they are unable to trust

12    anyone else in their community or anyone else in the funeral

13    home industry with those end-of-life determinations.  And your

14    fraud, not necessarily the abuse of corpse that you will be

15    sentenced separately, has kicked off a chain reaction within the

16    community that this sentence appropriately considers in terms of

17    determining the appropriate sentence.

18    Now, there was much argument made about needing to

19    avoid unwarranted sentencing disparities among defendants with

20    similar conducts who have been found guilty -- I'm sorry -- with

21    similar records who have been found guilty of similar conduct,

22    but as stated by many of the victims here today and the

23    Government, this Court concludes by looking at the record as a

24    whole, looking through the lens of the elements of wire fraud,

25    looking and focusing on those elements of deceit and fraud, that

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   this is no ordinary wire fraud case, and nor could it ever be.

2            And the supposition that somehow the Hess case and the

3   conduct of those individuals was the maximum and everything else

4   should work downwards from there, this Court respectfully

5   disagrees.  There is a threshold that the law gives me, which is

6   a maximum sentence for wire fraud, but that doesn't mean that

7   the worst conduct is the maximum, and then I move down from

8   there.  There has to be some calculation that some threshold

9   conduct meets the maximum sentence, because that maximum

10  sentence not only takes into account the calculation of

11  accountability for wire fraud, but also in its best form, the

12  Sentencing Reform Act and the sentencing guidelines tends and

13  tries to take into account also the humanity of the defendant

14  who stands before me.

15           And, Mr. Hallford, I have also attempted to account for

16  your humanity in this sentence.  Your -- these statements of

17  your own, I focused on those statements, because those

18  statements are the statements that drove this Court's

19  determination with respect to the sentence.

20           It is for all of these reasons that the Court will vary

21  from the advisory guideline range for the following -- for those

22  reasons, and pursuant to the Sentencing Reform Act of 1984, it

23  is the judgment of this Court that the defendant Jon M. Hallford

24  is hereby committed to the custody of the Bureau of Prisons to

25  be imprisoned for a term of 240 months.  The term of

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1     Sentencing Hearing     06-27-2025

1   imprisonment imposed by the judgment will run concurrently with

2   your sentence anticipated in El Paso County Court case number

3   2023-CR-4849.

4          Upon release from imprisonment, you shall be placed on

5   supervised release for a term of three years.  Within 72 hours

6   of release from custody of the Bureau of Prisons, you shall

7   report in person to the probation office in the district to

8   which the defendant is released.  While you are on supervision,

9   you must not commit another federal, state, or local crime, and

10  you must not unlawfully possess a controlled substance.  You

11  must refrain from any unlawful use of a controlled substance.

12  You must submit to one drug test within 15 days of release from

13  imprisonment, and a maximum of 20 tests per year of supervision

14  thereafter.

15         You must make restitution in accordance with 18 USC

16  Sections 3663(a) and 3663 -- I'm sorry.  3663 and 3663(a), or

17  any other statute authorizing a sentence of restitution.  You

18  must cooperate in the collection of DNA as directed by the

19  probation officer.  You must comply with the standard conditions

20  adopted by the Court in general order 2020-20.

21         The Court finds that the following special conditions

22  of supervised release are determined to be reasonably related to

23  the factors enumerated by 18 USC Section 3553(a) and 18 USC

24  Section 3583(d).  Further, based on the nature and circumstances

25  of the offense and the history and characteristics of this

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    particular defendant, the following conditions do not constitute

2    a greater deprivation of liberty than is reasonably necessary to

3    accomplish the goals of sentencing.

4         One, if the judgment imposed a financial penalty or

5    restitution, you must pay the financial penalty or restitution

6    in accordance with the scheduled payment sheets of this

7    judgment.  You must also notify the Court of any changes in

8    economic circumstances that might affect your ability to pay the

9    financial penalty or restitution.

10        Two, you must incur [sic] new credit charges or open

11   additional lines of credit without approval of the probation

12   officer, unless you are in compliance with the periodic payment

13   obligations imposed pursuant to the Court's judgment and

14   sentence.

15        Three, you must provide the probation officer access to

16   any requested financial information and authorize the release of

17   any financial information until all financial obligations

18   imposed by the Court are paid in full.

19        Four, you must apply any monies received from income

20   tax refunds, lottery winnings, inheritances, judgments, and any

21   anticipated or unexpected financial gains to the outstanding

22   court ordered financial obligation in this case.

23        Five, if you have any outstanding financial

24   obligations, the probation office may share any financial or

25   employment documentation relevant to you with the asset recovery

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    division of the United States Attorney's Office to assist in the

2    collection of that obligation.

3        Six, you must participate in a program of cognitive

4    behavioral treatment approved by the probation officer, and

5    follow the rules and regulations of such program.  The probation

6    officer in consultation with the treatment provider will

7    supervise your participation in the program as to modality,

8    duration, and intensity.  You must pay for the cost of treatment

9    based on your ability to pay.

10        Seven, you must engage in an -- you must not engage in

11    an occupation, business, profession, or volunteer activity that

12    would require or enable you to be involved in the funeral,

13    cremation, or burial business without prior permission of the --

14    your probation officer.

15        Eight, any business you operate during the term of

16    supervision must be approved by the probation officer.  You must

17    operate under a formal registered entity, and you must provide

18    the probation officer with the name of the business entity and

19    its registered agents.  You must maintain business records and

20    provide all business documentation and records as requested by

21    the probation officer.

22        The determination of restitution -- you must make

23    restitution to the victims in the amounts indicated in the

24    presentence and -- presentence investigation report and related

25    attachments.  The total restitution amount is reflected in the

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   third addendum to the presentence investigation report of

2   $193,966.18 to the victims, and $876,447.56 to the Small

3   Business Administration, for a total of $1 million --

4   $1,070,413.74.

5           It is ordered that restitution be jointly and severally

6   with the following codefendant: Carie L. Hallford, case number

7   24-cr-113-2, to be determined.  Once restitution is determined,

8   each victim shall receive an approximately proportional payment

9   based on the victim's share of the total loss.

10          You are ordered to pay a special assessment fee of $100

11  due and payable immediately.  The Court finds that the defendant

12  does not have the ability to pay a fine, so the Court will waive

13  the fine in this case.  The Court has determined that the

14  Court -- the defendant does not have the ability to pay interest

15  on the final restitution amount, and it is ordered that the

16  interest requirement is waived for restitution.

17          It's ordered that the payment of the monetary

18  obligation shall be due as follows:  The special assessment and

19  restitution obligations are due immediately.  Any unpaid

20  restitution balance upon release from incarceration shall be

21  paid in monthly installment payments during the term of

22  supervised release.  The monthly installment payments will be

23  calculated as at least ten percent of the defendant's gross

24  monthly income.

25          Pursuant to Rule 32.2 of the Federal Rules of Criminal

Kevin P. Carlin, RMR, CRR

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1   Procedure, the defendant must forfeit his interest in the

2   following property to the United States: a money judgment in the

3   amount of proceeds obtained by the defendant in the scheme.

4        The defendant is advised of his right to appeal the

5   sentence.  If you so desire to appeal, a notice of appeal must

6   be filed with the clerk of the court within 14 days after the

7   entry of judgment, or the right to be -- right to appeal will be

8   lost.  If the defendant is unable to afford an attorney on

9   appeal, the Court will appoint one to represent you.  And if you

10  so request, the clerk of the court must immediately prepare and

11  file a notice of appeal on behalf of the defendant.

12       Mr. Hallford, today you have talked about your actions

13  depriving your parents and your family, including your children,

14  of moments in their lives, and the Court has accounted for that

15  in determining the sentence.  And I -- I empathize with the fact

16  that those individuals who are important in your life will not

17  have you be part of their life for quite some time.

18       I very much hope that you are sincere and you follow

19  through in the fact that you would like to live your life in a

20  different way than you did in those four years, and you actually

21  contribute to the community.  And hopefully, if that can occur,

22  that there will be some healing not only with respect to the

23  individuals impacted by the wire fraud that was conducted

24  through -- from at least September of 2019 through October of

25  2023, but that those individuals, including your parents and

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    your children, can look at you and know that you have taken full

2    accountability for the actions that have occurred.

3           I wish you luck, Mr. Hallford.  It's ordered that the

4    defendant is remanded to the custody of the United States

5    Marshal.

6           Anything further on behalf of the Government?

7           MR. NEFF:  No, Your Honor.  Thank you.

8           THE COURT:  Anything further -- oh.  I will make the

9    recommendation of designation to the facilities as requested by

10    the defendant, El Reno or Texarkana.

11           MS. SUELAU:  Thank you, Your Honor.  We would also ask

12    as requested in our sentencing statement that Your Honor not

13    order the payment of restitution during the period of

14    imprisonment.

15           THE COURT:  I've already waived the interest, but I'm

16    going to have the order of restitution be due and payable

17    immediately, as previously ordered.

18           MS. SUELAU:  Understood.  Also, for purposes of the

19    record, given recent Tenth Circuit precedent on waiver, I object

20    to Your Honor's sentence as substantively unreasonable,

21    specifically, but among other things, Your Honor to rely on

22    Mr. Hallford's conduct during the course of this offense

23    particularly.

24           Reliance on text messages between 2019 and 2020, when

25    *Pepper versus United States*, that's 562 U.S. 476, 2011, directs

24-cr-113-NYW-1    Sentencing Hearing    06-27-2025

1    Your Honor to consider all conduct by Mr. Hallford, including

2    before the instant offense and the conduct that's happened -- or

3    rehabilitation that's happened since the instant offense, the

4    statements of remorse, his expressions of acceptance of

5    responsibility today, and through his persistence in maintaining

6    the plea agreement.  So, for those and -- for those reasons

7    outlined in our sentencing statement, we object to Your Honor's

8    sentence as substantively unreasonable.

9         THE COURT:  Thank you.  Anything else?  All right.

10   Thank you very much.  We will be in recess.

11        (Proceedings concluded at 12:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11          Dated this 7th day of August, 2025.

12

13

14

15

16   _____
     Kevin P. Carlin, RMR, CRR
17   Official Court Reporter

18

19

20

21

22

23

24

25